# Illinois Official Reports

## Appellate Court

*People v. Crawford*, 2013 IL App (1st) 100310

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANDRE CRAWFORD, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-10-0310 |
| Rule 23 Order filed | November 12, 2013 |
| Rule 23 Order withdrawn | December 6, 2013 |
| Opinion filed | December 16, 2013 |

| | |
|---|---|
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for the first degree murders and aggravated criminal sexual assaults of 11 women and the attempted first degree murder and aggravated criminal sexual assault of a twelfth woman were upheld over his contentions that the cause should be remanded for a *Batson* hearing, that the evidence did not support one of the convictions, that his counsel was ineffective in failing to object to certain DNA evidence, and that the trial court erred in admitting testimony concerning an autopsy report by an examiner who did not prepare the report, since the record supported the State's race-neutral explanation for its peremptory challenge of a prospective juror, the evidence was sufficient to sustain the challenged conviction, neither prong of *Strickland* was met with regard to the claim of ineffective assistance of counsel, and defendant's confrontation rights were not violated by the testimony of the medical examiner who did not perform the autopsy at issue. |

| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 00-CR-5454 through 00-CR-5465; the Hon. Evelyn B. Clay, Judge, presiding. |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Jessica A. Hunter, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Mary L. Boland, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE DELORT delivered the judgment of the court, with opinion. Presiding Justice Connors and Justice Cunningham concurred in the judgment and opinion. |

**OPINION**

¶ 1      Following a jury trial, defendant Andre Crawford was convicted of the first degree murders and aggravated criminal sexual assaults of 11 women, and the attempted first degree murder and aggravated criminal sexual assault of a twelfth victim (720 ILCS 5/8-4, 9-1, 11-1.30 (West 2010)). A jury found him to be eligible for the death penalty but declined to impose it. He was instead sentenced to life imprisonment. On appeal, defendant contends that: (i) this case must be remanded for a *Batson* hearing; (ii) the evidence was insufficient to support the jury's verdict of guilty as to the murder of Rhonda King; (iii) in 6 of the 12 cases against him, he was denied a fair trial based upon his counsel's failure to argue the impact of a deoxyribonucleic acid (DNA) match at only five loci, as well as the State's claim in its opening statement and rebuttal closing argument that the DNA recovered was defendant's; and (iv) his confrontation rights were violated when the trial court allowed a medical examiner to testify as to an autopsy report that was prepared by a nontestifying medical examiner, where the autopsy report's findings were used as substantive proof of the manner of Nicole Townsend's death. For the following reasons, we affirm the judgment of the trial court.

¶ 2                                    I. BACKGROUND

¶ 3      Over a six-year period beginning in 1993, there was a series of murders in the Englewood neighborhood in Chicago. The female victims all had a single male suspect's DNA in common. A joint task force comprised of officers and agents of the Chicago police department

- 2 -

and the Federal Bureau of Investigation began investigating these murders in 1999. About a year later, defendant, Andre Crawford, was arrested on an unrelated matter and brought in for questioning. He subsequently agreed to submit a DNA sample and later provided video-recorded confessions to the crimes. As a result, the State charged defendant with over 200 counts concerning the first degree murders and aggravated criminal sexual assaults of: Sheryl Johnson (docketed in the trial court as case number 00 CR 5454), Tommie Dennis (No. 00 CR 5455), Shaguanta Langley (No. 00 CR 5456), Sonji Brandon (No. 00 CR 5459), Cheryl Cross (No. 00 CR 5460), Evandre Harris (No. 00 CR 5461), Nicole Townsend (No. 00 CR 5462), and Constance Bailey (No. 00 CR 5463). In addition, the State charged defendant with three counts each for the first degree murders of: Patricia Dunn (No. 00 CR 5458), Angela Shatteen (No. 00 CR 5464), and Rhonda King (No. 00 CR 5465). Finally, the State charged defendant with 17 counts related to the aggravated criminal sexual assault and attempted murder of Claudia R. (No. 00 CR 5457).[1] The parties agreed to join these 12 cases for trial before a single jury.

¶ 4                                    A. *Voir Dire* and Other Pretrial Matters

¶ 5        Before trial, defendant moved to preclude testimony by Dr. Nancy Jones as to the autopsy on Nicole Townsend that was performed by Dr. Barry Lifschultz, arguing that not to do so would be a violation of defendant's confrontation rights under *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). The trial court denied defendant's motion.

¶ 6        Jury selection began on November 2, 2010. The trial court first questioned the venirepersons, pursuant to *Witherspoon v. Illinois*, 391 U.S. 510 (1968), to determine whether, as a result of "conscientious or religious scruples," the potential juror would automatically vote against a death sentence, regardless of the evidence.

¶ 7        Potential juror Norman Phillips stated that he had "religious reasons" against imposing the death penalty, but commented that he was not "100 percent sure" he could sign such a verdict. Amber Ross-Garrett initially stated that she was "not sure" that she would be able to sign her name on a death sentence verdict, but admitted that she "would have to" if the law and evidence demanded it. Willie Payton said he would vote in favor of a death penalty "in an extreme case, that it was premeditated" murder and the accused had been proved guilty "beyond a doubt." Payton stated that, if given a choice, he would "automatically" vote for a life and not a death sentence, but he subsequently clarified that he would not automatically do so in an extreme case "like multiple murders" or where "justice would be served." The State exercised peremptory challenges against Phillips, Ross-Garrett, and Payton, all of whom were then excused from further service.

_____

[1]Prior to trial, the State dismissed 139 of the counts by *nolle prosequi*, leaving: (a) 3 counts of first degree murder and 4 counts of aggravated criminal sexual assault as to Langley, Townsend, Dennis, Johnson, Bailey, and Brandon; (b) 3 counts of first degree murder and 16 counts of aggravated criminal sexual assault as to Cross; (c) 3 counts of first degree murder and 8 counts of aggravated criminal sexual assault as to Harris; and (d) 2 counts of attempted murder and 4 counts of aggravated criminal sexual assault regarding Claudia R.

¶ 8 During the questioning of venireperson Robert Kingery, the following colloquy took place:

"Q. [Trial court:] Do you have any scruples, by which I mean strong feelings by reason of religion, morals or conscience against the imposition of the death penalty.

A. [Kingery:] Somewhat. I'm Catholic. I'm pretty much against the death penalty. I would be hard-pressed to vote for it.

Q. Are your beliefs such that regardless of the facts of the case or the background of the defendant, that under no circumstances could you consider signing a verdict directing the court to sentence the defendant to death?

A. Under no circumstances, I couldn't say that.

Q. All right. So would your beliefs about the death penalty prevent or substantially impair your ability to reach a fair and impartial decision as to whether the defendant was guilty? That's going back to the first stage.

A. No."

¶ 9 The State then asked Kingery whether his views on the death penalty were based upon his religion, to which he responded that they were and that the death penalty was "the ultimate penalty." Kingery added that he would have to see "indisputable evidence" that the death penalty was appropriate, and in response to the State's question, confirmed that he would not automatically vote against it. Kingery explained that, to him, "indisputable evidence" was evidence that "would convince [him] that [defendant] is guilty of killing these people." Kingery further stated that if he were "thoroughly convinced of that," then he could vote in favor of the death penalty. Finally, when the State asked Kingery, "[W]ould you be able to sign your name on a death verdict if you were convinced that death was the appropriate sentence?" Kingery responded, "Yes."

¶ 10 Following defendant's trial attorneys' questioning of Kingery, the State moved to exclude Kingery for cause based upon (i) his opposition to the death penalty absent indisputable evidence and (ii) his statement that he would be "hard-pressed" to vote in favor of a death sentence. The trial court, however, rejected the State's motion. The State did not lodge a peremptory challenge against Kingery, and he was later accepted as a juror. The record does not indicate his race.

¶ 11 During the *voir dire* of Lois Marshall, the following exchange took place:

"Q. [Trial court:] Do you have any *** strong feelings *** against the death penalty[?]

A. [Marshall:] Technically, I don't believe in the death penalty. But *** I will give a fair answer if I have to based on the evidence[;] I just don't believe it.

It's almost like a moral issue for me. *** I just don't believe it. I believe in life in prison. But then sometimes I think about if that happened to my family member, I might change my viewpoint. Something really terrible happened to my daughters, I might change my viewpoint, but technically I really don't believe in it.

Q. Are your beliefs such that regardless of the facts of the case or the background of the defendant, that under no circumstances could you sign a verdict for the death penalty?

- 4 -

A. That would be based on the evidence when I hear it, then I probably can assess it.

Q. You have to let us know whether or not you could sign a verdict for the death penalty ***.

A. I believe so."

¶ 12    The State then asked Marshall whether her beliefs against the death penalty were so strong that she would "automatically" vote for a life sentence and reject a death sentence. Marshall, however, responded that she would not.

¶ 13    The State sought to excuse Marshall from the jury, but the defense lodged an objection based upon *Batson v. Kentucky*, 476 U.S. 79 (1986). The following discussion then took place:

"THE COURT: What is your showing?

MR. LYON [defense counsel]: Our showing is that the State has used strikes to remove the only two black males who were sent back for consideration, and they have now used two more strikes to strike two more–to strike–this is the second black female upon whom they have exercised a strike.

They have accepted only one and tendered only one black female among their strikes in the course of using their strikes.

So what that means essentially is that the State has used half of their strikes to strike black jurors, and in using half of their strikes to strike black jurors, they have stricken four out of the six black jurors who have come forward to be passed upon by the parties. One they accepted, and one we struck. So those are the two that they did not strike. The other four they did strike.

That's of the possible black jurors upon whom they could exercise strikes. They have exercised strikes on two-thirds of the black jurors who have been presented for consideration. I submit that that percentage is a sufficiently high one to provide a *prima facie* case of racially-motivated strikes.

Secondly, we would say that Miss Marshall, whom they are now striking, gave no answers significantly or substantially different from white jurors whom they have accepted as to give a race-neutral basis for striking.

THE COURT: Could you be more specific, that her background, her statistics, her status is similar to Caucasian jurors who have been seated?

MR. LYON: That is what we are saying. We are saying among the nine who are seated, we believe–well, we believe that the percentage that I cited, that is the two-thirds of the available black jurors, have been stricken by the State of itself provides sufficient evidence of a pattern to create a *prima facie* case.

We submit that, in addition to that, there is nothing about Miss Marshall that sets her apart from white jurors whom the State has accepted. We believe that the burden should shift based on the percentage to the State to offer race-neutral reasons for rejecting or striking Miss Marshall.

THE COURT: Based on that proffer, the Court finds a *prima facie* basis, and we will move to the next stage.

- 5 -

State, your race-neutral reasons, if any?

MR. McKAY [the State]: Your Honor, for the record, we would object to the *Batson* motion.

\*\*\*

We believe, your Honor, that no *prima facie* case has been met. However, if you believe based on defendant's arguments to this Court that the *prima facie* case has been met, we would respectfully state to the Court that we have only used now, including Miss Marshall, nine challenges. Of that, five of them have been exercised against individuals that are not African-American. Counsel's motion is offensive, frankly.

In addition to not establishing a pattern of discrimination in the use of the peremptory challenges, there are several reasons that Miss Marshall is worthy of a peremptory challenge by the cause, not the least of which is, she is against the death penalty because of moral issues as she stated during the *Witherspoon* portion.

She does not believe in the death penalty I believe is what she clearly stated. That in and of itself is a sufficient reason, because a person's feelings on the death penalty is and always has been a race-neutral reason sufficient to overcome any kind of a *Batson* challenge.

THE COURT: The Court finds there's not been any violation of *Batson*. The State set forth its race-neutral reasons based on her responses in the individual *voir dire* to the *Morgan-Witherspoon* questions.

I submit that statistics such as three-quarters of African-Americans have been stricken is not dispositive of a *Batson* issue because three-quarters of them quite possibly could have stated that they were against the death penalty.

So just based on the fact of their race and so many of them being stricken, a large number of them being stricken, does not itself point to a *Batson* violation. This is why I asked if there were statistics of this woman, rather information about this woman that were similar, and that would be responsive to *Batson Witherspoon* [*sic*], that were similar to someone that the State–a non-minority that the State has seated.

So the Court finds no *Batson* violation."

¶ 14    At that point, defense counsel said that he "thought" that he would have the opportunity to respond to the State's purported race-neutral explanation by "point[ing] to similarly-situated non-black jurors whom the State has kept." The trial court, however, told defense counsel that he had to make a "substantial showing," *i.e.*, that the challenged individual had a similar background to others who had been seated. The trial court further observed that it had found a *prima facie* case based upon defense counsel's "statistics" and the general statement that Marshall's background was similar to others who had been seated, but the statement was not specific. Defense counsel countered that he believed he would have the opportunity to rebut the State because it could not address the State's response without hearing it first. The trial court, however, reiterated that defense counsel had to provide a similarity between Marshall and another juror who had been seated, but defense counsel did not, only making the claim "in a general way." The trial court noted that the State provided a "specific race-neutral reason" for

its peremptory challenge of Marshall, notably "her response to *Morgan-Witherspoon*." Defense counsel then asked whether he could then return to his remaining peremptory challenges against other potential jurors, and the trial court confirmed that he would. The jury was later selected and sworn in, and the case proceeded to opening statements.

¶ 15                            B. The State's Opening Statement

¶ 16        Immediately before opening statements, the trial court admonished the jury that opening statements were not evidence; they were only to acquaint the jury with the case and represented what each side expected would be proven during the trial. The State made the following comments during its opening statement:

> "MR. McGUIRE [the State]: [Defendant] did everything he could to eliminate any physical evidence tying him to any of the crime scenes. But the one thing he could not eliminate was the DNA evidence in this case. ***
>
> * * *
>
> The medical examiners in this case took vaginal, rectal and oral swabs of the victims. The ones that they could take DNA from. Some of the bodies were so badly decomposed that there was no DNA evidence. Skeletal remains were found.
>
> From 1993 to 1999 as the body count rose, the DNA evidence was coming in on several of the victims. A DNA profile was developed. The problem was they had a DNA profile, but they had no one to match it to. ***
>
> [The Chicago police department, as part of a task force,] went around and took buccal swabs from people, to eliminate possible suspects.
>
> MR. KENNELLY [Defense counsel]: Object, your Honor.
>
> THE COURT: Overruled.
>
> MR. McGUIRE: During that time, they swabbed over 500 people. ***
>
> * * *
>
> *** There was one offender, and one offender only with that DNA that was present in the bodies. ***
>
> Out of the 11 women killed, seven of them had DNA in some fashion. The eighth person, Claudia R***, survived. She also had DNA. So out of eight, out of the 12 cases, there's DNA evidence that ties to only one person, this man right here.
>
> No other DNA. And the DNA isn't like one in 4, one in a thousand. One in a million. Not even one in a billion.
>
> MR. KENNELLY: Object, your Honor.
>
> THE COURT: Overruled.
>
> MR. McGUIRE: It's one in 30 billion. Using one test called RFLP. And one in 11 trillion when using PCR.
>
> * * *

*** When Nicole Townsend's body was found on August 13, 1998, an autopsy revealed that she had died of strangulation. The defendant's DNA[,] although not found in her, his DNA was found on a piece of panty hose close to the body."

¶ 17 At the conclusion of opening statements, the State presented its case-in-chief. At trial, about 90 witnesses testified and approximately 450 exhibits were admitted. The transcript spans nearly 10,000 pages. Several witnesses testified regarding more than one victim. For ease of analysis, though, we present the evidence sequentially by victim rather than by witness.

¶ 18                            C. Rhonda King (No. 00 CR 5465)

¶ 19 Katrina Martin testified that she knew Rhonda King and considered her a friend. According to Martin, they were also both drug addicts and prostitutes. Martin admitted to two prior drug-related convictions in 1999 and 2000, but testified at the time of trial that she had been "clean" for the previous 10 years. Martin knew defendant as "Dre," and she knew another individual who frequented the area by the name of Hubert Geralds. Martin was also aware that defendant typically carried a knife on him, but she had never seen defendant hurt anyone with it.

¶ 20 Martin said that the last time she saw King alive was a few weeks before December 21, 1994. She and King were walking with defendant, and in exchange for half a bag of "crack," Martin let defendant use her crack pipe. At some point, defendant and King agreed to trade drugs for sex, which Martin had seen them do in the past. Defendant and King then walked down an alley near 50th Place. Martin never saw King alive again.

¶ 21 On December 21, 1994, an individual who was renovating a boarded-up building at 823 West 50th Place found King's partially skeletonized body on the third floor. The only entrance to the building was through the back, where the plywood had been removed from the doorway. King's body was unclothed except for a coat and cushion covering the head.

¶ 22 The medical examiner's "case report" noted that King's body "appear[ed] to have been partially eaten by rodents and dogs," and that rodent and dog feces were near the remains. The case report further described no obvious signs of trauma but noted a bloodstain about two feet from King's head. King's body was then transported to the medical examiner's office for further examination.

¶ 23 The medical examiner's postmortem report indicated that the soft tissues of the neck were absent, leaving only the cervical vertebrae. The upper chest was skeletonized, the chest and abdomen were "mummified," and the soft tissues of the genitalia were absent. The report described the back as "white tan with adipocere hair formation," and noted there were numerous large maggots in the thoracic and abdominal cavities but no organs. The cause of death was listed as undetermined.

¶ 24 Chicago police detective Cliff Gehrke stated that he and his partner had been dispatched to the scene, and after King's remains had been transported from the scene to the medical examiner's office, he conducted an investigation by showing her Cook County jail identification card to local residents. On cross-examination, Gehrke testified that, after he received the results of the autopsy, the case was "suspended," which Gehrke explained meant

that it remained a death investigation in the absence of any new leads or evidence. Gehrke further admitted that there was "no direct indication of foul play at that time." On redirect examination, Gehrke explained that, although there was the presence of blood, there was no "witness testimony or a gun or *** shell casings" that would clearly point to foul play. Gehrke further agreed that he suspected that foul play had been involved. On re-cross-examination, however, Gehrke conceded that he did not find any weapons or "instrumentalities" that could have caused King's death, such as a knife blade or a gun. Gehrke also acknowledged that, at that time, he did not know the cause of the pool of blood near King's head.

¶ 25 Dr. Adrienne Segovia, an assistant medical examiner with the Cook County medical examiner's office, testified that she performed the autopsy on King on December 22, 1994, while she was doing her fellowship training. Segovia testified that King's remains from the skull to the collarbones and parts of her arms were skeletonized, *i.e.*, they contained no soft tissues, such as skin, subcutaneous fat, muscle, veins, nerves, or arteries. In other areas, the remains were partially mummified, which Segovia described as tissue that had dried out and taken on a firm leathery consistency, and she recounted the presence of adipocere, a waxy substance that forms from the decomposition of fat. Segovia further noted that there was activity by maggots in the genitalia, and maggots were still present at the time of the examination. Segovia explained that maggots are drawn to areas that are softest, such as the eyes, nose, mouth, or genitalia, or where the skin has been "compromised or injured," such as from a stab wound.

¶ 26 Segovia said that, when she entered the abdominal cavity, there were no organs present in either the chest or abdomen. In Segovia's words, "Miss King was, in these areas, almost like a shell. She was hollow inside." Segovia added that, when she opened the skull, the brain was absent.

¶ 27 Although the skull, jawbone, and neck bones were present, Segovia stated that the hyoid bone was missing. She said, however, that it was not unusual in these situations because of the possibility of predation by animals or insects. Segovia explained that, especially with animal predation, the tissues–and whatever the tissues are attached to–will be carried or dragged away and the remaining structures will then be scattered elsewhere.

¶ 28 Segovia did not find any evidence of strangulation or stabbing. Segovia also was unable to obtain any oral, vaginal, or rectal swabs because there was no oral cavity present, and there was no vagina or rectum present, only the vaginal and rectal orifices, which communicated directly into an empty cavity containing maggots. Segovia identified what appeared to be bloodstains on King's clothing as well as an apparent pool of blood about two feet from King's head at the scene. Segovia stated that she could not determine the cause of death because of the state of King's remains, but the scene was "highly suspicious." She did admit, however, that the presence of blood was more indicative of a stabbing than strangulation, and that it was "possible" that King died of a stab wound. Segovia also agreed that there was no evidence of a stab wound to the neck, because there was no neck for her to examine.

¶ 29 On cross-examination, Segovia stated that she could not determine whether the pool of apparent blood near King's head was human blood or when the pool formed. She also admitted that she had examined King's back but found no evidence of a stab wound, that no foreign

objects (such as a knife blade) were found in King's body, and there were no fractures, nicks, or other indications of a stab wound on King's spinal cord. Segovia also agreed that it was possible that King died from strangulation. Segovia stated that she had never before testified that it was possible King died of a stab wound because this was the first time she had been asked that question.

¶ 30　Assistant State's Attorney Kevin Byrne testified that, on June 19, 1995, he interviewed Hubert Geralds, who at the time was in custody for six murders. Byrne stated that, after advising Geralds of his *Miranda* rights, he spoke with Geralds and showed Geralds a photograph of King. According to Byrne, Geralds said King was "one of the women he strangled and killed." Byrne gathered additional details from Geralds about King's murder, and Geralds elected to provide a written statement, rather than one prepared by a court reporter. Byrne confirmed that a video-recorded statement was unavailable at that time. Once the handwritten statement was complete, Byrne offered Geralds the opportunity to make any additions, deletions, or corrections. Other than one correction, Geralds did not ask for any additional details to be put into the statement and Byrne did not put anything into the statement that Geralds did not say. Byrne stated (and the parties subsequently stipulated) that Geralds also wrote on the back of King's photograph, "this is the woman I choked in the building," and signed his name below that statement. Without objection from the State, the trial court then allowed Geralds' written statement to be published to the jury.

¶ 31　Geralds' written statement provided that, in December 1994–"sometime before Christmas," he went to the area of 54th and Morgan and bought eight bags of "rock" from a woman who was a friend of his sister Angela and whom he later identified in a photograph as King. Geralds stated that he then went with the woman to an abandoned building and smoked five of the bags he had just purchased. King then wanted to smoke more, but Geralds refused, and after King's repeated requests to smoke more, Geralds placed King in a "chokehold," with his arm around her neck. Geralds said he held her until King was no longer talking and breathing. Geralds then removed some of her clothes to make it appear that she had been raped, and he left her in the attic of the building, which he believed was around 50th Place and Halsted.

¶ 32　The parties stipulated that, on February 10, 2000, the State moved to vacate Geralds' conviction and death sentence for King's murder. On cross-examination, Byrne agreed that there was a "link" between five of Geralds' six victims, and that no DNA had been recovered from King. Byrne further agreed that Geralds' other five murder convictions were unaffected by the dismissal of the conviction for King's murder.

¶ 33　Assistant State's Attorney Margaret Wood testified that, on January 29, 2000, after she had already taken defendant's confessions to various murders, defendant told her he had something to tell her, but he was worried she would be angry with him. Wood assured defendant that she would only be upset with him if he were not telling the truth. At that point, defendant told her that he had remembered committing three additional murders, including that of King.

¶ 34　Defendant's video-recorded confession was played for the jury. Defendant stated that he had known King for about two years prior and had previously exchanged drugs for sex with her. Sometime in the middle of fall in 1994, defendant met King outside of a currency

exchange in the area of West 51st Street and South Halsted Street. Defendant said he and King agreed to again trade drugs for sex, and they walked down an alley behind the currency exchange. They came upon a boarded-up two-flat wooden house on West 50th Street near Halsted. Defendant said the house had no porch stairs, so he had to lift King up onto the porch before lifting himself up. Defendant said King was short and slender, about 5 feet tall and light. Defendant lifted himself up by kicking a leg over and lifting himself up. The two then walked up the stairs to the second floor of the house and went inside. Once inside, they went up an internal staircase to an attic, where defendant found a seat and a bedroom.

¶ 35    In the attic, defendant said King changed her mind and said she wanted to "get high" before having sex with him. Defendant said he became angry because he felt that King was trying to back out of their "agreement." Defendant then said that, while King was seated, he reached into his pocket, pulled out a six-inch steak knife with a four-inch blade, walked up to King, reached behind her and stabbed her in the "upper back." The knife blade broke off and remained lodged in her back, leaving defendant with only the handle.

¶ 36    According to defendant, King then fell back and began shaking. Defendant removed King's pants and saw both that she was urinating and that a pool of blood was forming around her back. Defendant then pulled her about three feet away to a clear area. Defendant then had vaginal sex with King, ejaculating inside of her. Defendant said King appeared to be dead, and after having vaginal sex with her, he lifted King's feet over her shoulders and had anal sex with her, again ejaculating.

¶ 37    Defendant then left with King's shoes and the knife handle. Defendant disposed of each of King's shoes in different vacant lots and also discarded the knife handle as he walked and smoked his cocaine. About an hour later, defendant returned to the house where he left King.

¶ 38    Defendant went back up to the attic and saw King still lying there. Defendant stated he then had vaginal sex with King's body. Afterwards, he again lifted King's feet over her shoulders and had anal sex. Defendant saw a single tear fall from King's eye and stated that he "didn't feel too good about that." When asked why defendant returned to the house the second time, defendant responded, "It's obvious I *** enjoy having sex with dead bodies, you know, knowing that she was dead." Defendant left the house and did not return. Defendant said he had heard "a while later," and possibly a month or two after, that King's body had been found badly decomposed, and defendant thought that he "bought time" for the body not being discovered because "it was close to Fall and the temperature was dropping," which would "hide the stench of her body."

¶ 39    On cross-examination, Wood stated that she learned that Hubert Geralds had already confessed and had been convicted and sentenced to death for King's and five other murders, but she nonetheless believed defendant and not Geralds murdered King because of the details defendant provided. Wood also conceded that the police reports on King's murder did not indicate that King had been stabbed, but Wood still believed defendant's confession and not Geralds'. Wood explained that, due to the advanced decomposition of King's body, animals could have made away with the knife blade that defendant said had remained in King's back. Finally, Wood agreed that she never showed defendant a picture of King, but that she had

defendant identify all of the other victims in a photograph.

¶ 40                                 D. Nicole Townsend (No. 00 CR 5462)

¶ 41        On August 13, 1998, a real estate appraiser discovered the body of Nicole Townsend in the attic of an abandoned building at 5223 South Marshfield Avenue. Chicago police officer Scott Straka testified that he had been dispatched to the scene, and in the second-floor attic, he observed a "severely decomposing" body covered in flies and maggots and partially wrapped in a green blanket. Townsend's pants were off of one leg, her bra was pushed above her breasts, and her jacket was underneath her body. Chicago police detective Daniel McNally testified that Townsend's remains had been decomposing for so long that her skull separated from the rest of her body while her body was being prepared for removal. As a result, "She had to be shoveled into bags." Among the debris in the second-floor attic, an evidence technician with the Chicago police department recovered a pair of black pantyhose.

¶ 42        Nancy Jones, the chief medical examiner of the Cook County medical examiner's office, testified for the State as an expert in the field of forensic pathology. Defense counsel renewed his objection to Jones's testimony, arguing that Jones should not be allowed to testify as to the autopsy because she did not perform the autopsy. The trial court, however, overruled this objection. Jones testified that Dr. Barry Lifschultz performed the autopsy on Townsend's remains and that Lifschultz had since retired and moved to England. Jones reviewed Lifschultz's autopsy report and photographs, which were admitted into evidence without objection. Jones noted that Townsend's body was in an advanced state of decomposition. The skin was mummified, there was maggot activity (which Jones said would impair the ability to collect semen), and the remains were partially skeletonized with exposed bones and no soft tissue present. Internally, there were no organs.

¶ 43        On cross-examination, Jones agreed that Lifschultz initially made no determination as to a cause of death but that Lifschultz later concluded that strangulation was the cause of death based upon information Lifschultz received from police investigators. Jones testified that she concurred with Lifschultz's conclusion that Townsend's cause of death was strangulation.

¶ 44        Jones agreed that Townsend's neck cartilage and hyoid bone were intact. An indication of strangulation could be a broken hyoid bone. Jones further conceded that Townsend's hyoid bone was intact, but explained that an intact hyoid bone does not necessarily mean the decedent did not die of strangulation, because in younger people it can remain flexible and not break following manual strangulation, and certain methods of strangulation do not result in a broken hyoid bone.

¶ 45        Jennifer Schultz, a forensic scientist with the Illinois State Police, testified that the recovered pantyhose tested positive for the presence of semen, so she cut out the "stain" that tested positive to preserve it for further analysis. Illinois State Police forensic scientist Joanna Wenk testified as an expert in the field of forensic biology and DNA analysis concerning the various swabs taken from the other 11 victims. With respect to the Townsend crime scene, Wenk said that she analyzed the semen stain developed by Schultz for the presence of DNA, using a process known as "restriction fragment length polymorphism," or RFLP. The RFLP analysis results were that the DNA profile on the semen stain on the pantyhose from the

Townsend crime scene matched the profile obtained in the Angela Shatteen case. Wenk added that, when she compared the Townsend DNA profile to that of defendant, the profiles "matche[d]." Wenk explained that the DNA profile obtained from the pantyhose at the Townsend scene was expected to occur in "approximately one in 30 billion blacks, one in 10 billion Caucasian, or one in 22 billion Hispanics." Wenk then opined that, to a reasonable degree of scientific certainty, the semen identified from the pantyhose at the Townsend scene was "consistent with having originated from [defendant]."

¶ 46 On cross-examination, Wenk agreed that, in January 2000, the time she performed a DNA analysis of defendant's buccal swab, new cases were being processed under the "STR" (short tandem repeat) method. Although Wenk also agreed that STR uses more loci (13) than RFLP (5), she disagreed that STR was a "better method." Wenk, however, conceded that the Illinois State Police lab replaced the RFLP process with STR. Wenk further admitted that, if there had been a five-loci match under RFLP, but a sixth locus did not match, "that would be an elimination."

¶ 47 On redirect examination, the State asked Wenk whether the "discriminatory or statistical power of an STR locus" was the same as that of an "RFLP locus." Wenk responded, "One area of the DNA in and of itself for STR may not be as discriminatory as one area of RFLP." The State then asked if there was "any sense in comparing the loci of RFLP to the loci of STR." Wenk explained that it did not because those are "two different types of DNA analysis."

¶ 48 In his video-recorded statement regarding this victim, which was played for the jury, defendant stated that he had known Townsend for a couple of years and had previously exchanged drugs for sex. Defendant said he met Townsend in the second week of August 1998 near West 53rd Street and South Ashland Avenue and agreed to exchange drugs for sex. They walked west to an abandoned, wood-framed house on Marshfield Avenue. They entered through the back and went up to the second floor. Defendant said that, while he remained standing, Townsend sat on the floor and began to perform oral sex on him but stopped after two or three minutes. According to defendant, Townsend then refused to continue unless defendant allowed her to get high. Defendant said he then began to strangle her, and they both fell down with defendant lying on top of her. Defendant kept strangling her until she lost consciousness. At that point, defendant removed her shoes, pulled her pants down, and then had vaginal and anal sex with her. Afterwards, defendant found "some type of material" and wiped his penis with it. Defendant could not recall whether he threw the material down or took it with him. Defendant left with Townsend's shoes and discarded them, one at a time. Defendant smoked his "crack" cocaine and returned to the scene.

¶ 49 Defendant went back up to the second-floor attic and saw Townsend lying unconscious. Defendant said that he again had vaginal and anal sex with Townsend, and ejaculated both times. Defendant threw something that was in the room on top of her "to cover her up" and delay the time until her body would be found.

¶ 50 E. Angela Shatteen (No. 00 CR 5464)

¶ 51 On April 3, 1995, amongst the debris in the attic of an abandoned house at 5043 South Carpenter Street, Angela Shatteen was found dead by a group of schoolchildren. Shatteen was

lying on a mattress, covered by a blanket, and naked from the waist down. A white piece of electrical cord was around her neck, and there was bruising on her forehead and left eye. An autopsy revealed that she had ligature marks and abrasions on her neck, and there were hemorrhages and tears in the neck muscles consistent with manual strangulation. In addition, the electrical cord that was wrapped around her neck was in a loop knot and showed some scrapes of skin that were consistent with the victim's efforts to remove the ligature with fingers or fingernails. The medical examiner who conducted the autopsy testified that there was blood and contusions on the lower lip and in Shatteen's cheek, which he opined came from pressure outside the mouth causing the teeth to cut the lip. In addition, the tongue was clenched between the teeth, and there was petechial hemorrhaging in Shatteen's eyes. A toxicology screen revealed the presence of cocaine and cocaine metabolites in her blood, and oral, vaginal, and rectal swabs were taken. Finally, the medical examiner opined that the cause of Shatteen's death was homicide by strangulation.

¶ 52    Illinois State Police forensic scientist Joanna Wenk testified that she tested the oral, vaginal, and rectal swabs and found semen on all of the swabs. Wenk stated that another forensic scientist, Pamela Fish, was assigned to conduct the DNA analysis of the swabs. Wenk performed a DNA analysis of the buccal swab from defendant using the RFLP protocol. After comparing the DNA profile from defendant's buccal swab with the DNA profile obtained from the vaginal swab of Shatteen, Wenk concluded that the buccal swab "matched" the DNA profile from the Shatteen vaginal swab. Wenk stated that the frequency of that profile would be expected to occur in approximately 1 in 30 billion blacks, 1 in 10 billion Caucasians, or 1 in 22 billion Hispanics.[2]

¶ 53    Pamela Fish testified that she had been a criminalist in the forensic division of the Chicago police department, and the trial court found her to be qualified to testify as an expert in the field of forensic DNA analysis. Fish stated that she developed a DNA profile for Shatteen from a sample of Shatteen's blood. With respect to the swabs that had been taken from Shatteen, Fish stated that an analysis of the vaginal swabs revealed two DNA profiles: one that "matched" Shatteen and another that was "open" in that Fish had no DNA profile with which to compare it. Fish then uploaded the open or "unknown" profile to the national DNA database, and kept the remaining sample from the swab in a freezer in the forensic division.

¶ 54    On cross-examination, Fish stated that she used RFLP analysis to develop the DNA profiles, which she said used six, not five, loci. Fish further stated that, although STR analysis used 13 loci and replaced RFLP analysis, she was "not too sure" that STR was "more discerning" than RFLP, and explained that she did not know what was meant by the term "more discerning."

¶ 55    Defendant's video-recorded statement regarding this victim was played for the jury. Defendant said that he had known Shatteen, or "Angel," for the previous two or three years and described her as a neighborhood prostitute and fellow drug user. In early April 1995, he met Shatteen on the corner of West 51st Street and South Carpenter Street, and she agreed to sex in exchange for drugs. They walked to an abandoned house near the intersection of West 50th

---

[2]Wenk's cross-examination and redirect examination are discussed *supra* ¶¶ 46-47.

Street and Carpenter. They went in through the back via an alleyway. They walked up the stairs to the first floor, and then walked up to the attic. According to defendant, Shatteen began performing oral sex on him, but then stopped and asked him for cocaine. Defendant said he then became angry and began choking her with his hands. Defendant said they were on a mattress, and after he had choked her for a couple of minutes, Shatteen turned over onto her stomach, which made defendant loosen his grip. Defendant said that he may have kicked her a couple of times, but he did not hit her, although he noted that Shatteen "somewhat fell off of the mattress" during the struggle and went "facedown" onto the floor. As Shatteen was trying to crawl away from him, defendant saw an extension cord near the mattress and wrapped it around her neck. He used the extension cord to strangle Shatteen, and he placed his knee on the back of her neck to increase pressure. Defendant said he held the cord "very tight" around her neck for about 10 minutes, until he observed that Shatteen had lost consciousness.

¶ 56    Defendant then turned Shatteen over onto her back and had vaginal sex with her. Afterwards, he turned Shatteen "off of the mattress on[to] her face" and had anal sex with her. Defendant said he ejaculated both times. Defendant then left with Shatteen's shoes and went for a long walk, during which time he discarded her shoes, one at a time. Defendant then returned to the scene, where he saw that Shatteen was still facedown on the side of the mattress. Defendant again had anal sex with Shatteen, and then turned her over and had vaginal sex with her. Defendant said he "pushed her back off of the mattress" and threw "debris and clothes on top [of] her to cover her."

¶ 57                          F. Evandre Harris (No. 00 CR 5461)

¶ 58    On August 13, 1998, Evandre Harris was found dead on the first floor of an abandoned house at 920 West 52nd Street. Her body was lying naked across an ottoman in the kitchen, and a telephone cord was about four feet from her body. Chief Medical Examiner Nancy Jones performed the autopsy on Harris. Jones testified that Harris's body was in an early state of decomposition, and maggots were present on the face, neck, lips, mouth, genitals, and anal region. Harris's body exhibited injuries around the forehead, right eye, face, wrist, and breasts. Internally, there was bleeding in the mucosa of Harris's mouth and the right side of the tongue. Jones also found that there had been hemorrhaging in Harris's neck muscles. In addition, there was a ligature abrasion around the sides of Harris's neck and hemorrhages in her esophagus, all of which Jones explained was evidence of ligature strangulation. Finally, Jones found evidence of bruising and hemorrhaging on Harris's brain. Jones opined that the cause of Harris's death was ligature strangulation and that cerebral injuries resulting from blunt force trauma were a contributing factor to Harris's death. Jones collected a blood sample, as well as mouth, vaginal, and rectal swabs from Harris.

¶ 59    A forensic biologist subsequently tested the swabs, and found the presence of semen on the vaginal swab and a trace amount of semen on the rectal swab. Illinois State Police forensic scientist Joanna Wenk testified that she analyzed the DNA on the vaginal swab using the RFLP protocol and found within a reasonable degree of scientific certainty that the DNA from the vaginal swab "matche[d]" defendant's DNA. Wenk reiterated that the DNA profile obtained from Harris's vaginal swab would be expected to occur in "approximately one in 30 billion

blacks, one in 10 billion Caucasians, or one in 22 billion Hispanics." Wenk further opined that, within a reasonable degree of scientific certainty, the semen obtained from Harris's vaginal swab was consistent with having originated from defendant.[3]

¶ 60 Defendant's video-recorded statement regarding Harris's murder was played for the jury. Defendant said that he met Harris, whom he described as 5 feet 5 inches tall and weighing about 180 pounds, near the intersection of West 53rd Street and South Halsted Street sometime around the second week of August 1998. Defendant and Harris agreed to exchange drugs for sex and walked west down 52nd Street to an abandoned house. They walked in through the back and stayed in the back room on the first floor. According to defendant, Harris sat on a foot stool that was about three feet square, took off her coat, and told defendant that she wanted to first "get high." Defendant refused, and Harris tried to leave. Defendant then started to strangle her, and Harris leaned back over the foot stool, turning around on her knees in an effort to stand up. Defendant said Harris was "wrestling, trying to get away from me," and during this struggle Harris hit her head. Defendant also recalled that, when Harris turned around to try and get up, he forced her head back down onto the floor, and he believed that Harris hit her head on the floor and the wall. At that point, while Harris was "face down," defendant saw "a cord or a rope," grabbed it, wrapped it around Harris's neck, strangling her until she was motionless. Defendant turned Harris back over onto her back and removed her clothes. Defendant wanted to "fondle with her, with her body and her breasts in particular."

¶ 61 Defendant then had vaginal and anal sex with her, ejaculating without a condom both times. Afterwards, defendant took Harris's clothes and shoes and left. Defendant walked for quite a distance, disposing of her clothing in different places. Defendant, however, could not remember if he took the rope or cord with him, as well. Defendant also smoked his cocaine and then returned within about an hour. When asked why, defendant candidly responded that he "enjoyed having sex with her while knowing that she was out of it, that she was dead." Defendant saw Harris still lying in the same position on the foot stool, "slumped over backwards *** on her back," and again had vaginal and anal sex with her, ejaculating without a condom both times. When he finished, defendant noticed that it was around 10:30 p.m., so he got onto a bus and went to work.

¶ 62 G. Cheryl Cross (No. 00 CR 5460)

¶ 63 On December 8, 1998, in the attic of an abandoned home at 1220 West 52nd Street, the decomposing body of Cheryl Cross was found. The owner of the house, Michael Neal, testified that he had been to the house in October or November but did not see anything at that time. Cross's body was naked from the waist down, her pants were wrapped around one ankle, and her blouse was open. She also had substantial injuries to her face, including a "gaping laceration" across her forehead and loose teeth around her body. In addition, a section of rope was still around Cross's neck and a knife blade was lodged in her back. On the second floor, a forensic investigator with the Chicago police department found another knife with an alligator logo on the handle, which Katrina Martin testified was similar to a knife defendant owned.

___

[3]Wenk's cross-examination and redirect examination are discussed *supra* ¶¶ 46-47.

When Cross's body was removed for transport to the medical examiner's office for an autopsy, investigators noticed a section of two by four underneath Cross's body and another piece to the right of her head.

¶ 64 James Filkens, the medical examiner who conducted Cross's autopsy, testified that the "gaping" laceration on her forehead was consistent with being hit with a pipe, and he observed that the bones in Cross's forehead and nose were fractured. The ligature mark on her neck was caused by a piece of rope or string placed around the neck. Cross also had abrasions on the right side of her neck, the left side of her face, and on her right knee. Filkens noted the stab wound and the presence of the knife blade in the middle of Cross's back. Substantial injuries were further noted to her skull and scalp, specifically, a subgaleal hemorrhage, which Filkens explained indicated "trauma or force" was applied to that area before Cross died. Filkens opined that the cause of death of Cross was the stab wound to the back, with the blunt force trauma to the head a significant contributing factor. Finally, Filkens stated that oral, vaginal, and rectal swabs were taken.

¶ 65 Joanna Wenk, the forensic scientist with the Illinois State Police, analyzed the DNA on the vaginal swab using the RFLP protocol. She testified that the DNA from Cross's vaginal swab "matche[d]" defendant's DNA. Wenk reiterated that the DNA profile obtained from the vaginal swab would be expected to occur in "approximately one in 30 billion blacks, one in 10 billion Caucasians, or one in 22 billion Hispanics." Wenk further opined that, within a reasonable degree of scientific certainty, the semen obtained from Cross's vaginal swab was consistent with having originated from defendant.[4]

¶ 66 In defendant's video-recorded statement, which the jury heard, defendant said that he had known Cheryl Cross as a prostitute for the previous two to five years. They had previously exchanged drugs for sex, and they agreed to do so again in the first week of December 1998, when defendant met Cross near the intersection of West 51st Street and South Loomis Street. They walked to a two-story abandoned brick building in the 1200 block of West 52nd Street, entered through a back window, and went up to the attic.

¶ 67 When they got to the attic, defendant said he had recalled that Cross had stolen $13 from him the last time they had exchanged drugs for sex, and defendant said he became angry, so he plunged a six-inch steak knife into her back. Cross screamed and turned quickly. As she turned, the knife handle broke away from the blade, the handle remaining in defendant's hand while the blade remained in Cross's back. Defendant then began strangling her, but Cross struggled, and they fell to the ground.

¶ 68 Cross then turned over to try and get up, but defendant took a nearby rope and wrapped it around her neck. Defendant kept twisting it, holding it around her neck. When Cross lost consciousness, defendant rolled her onto her back and struck her in the forehead with a steel pipe. Defendant noted that he hit her with such force he could see her skull.

¶ 69 At that point, defendant removed her pants and shoes, and had vaginal sex with her. He then turned her over and had anal sex with her. Defendant said he did not wear a condom. When he finished, defendant took Cross's shoes, the pipe, and knife handle, and left.

---

[4]Wenk's cross-examination and redirect examination are discussed *supra* ¶¶ 46-47.

Defendant said he took a long walk, during which he got rid of the evidence, throwing away one shoe at a time. Defendant said he then "got high" and returned to the scene, where he found Cross in the same position. He again had anal sex, followed by vaginal sex until he ejaculated, and left.

¶ 70                                    H. Sheryl Johnson (No. 00 CR 5454)

¶ 71        On April 20, 1999, Chicago police officer Daniel Kienzle discovered the body of Sheryl Johnson in an abandoned house at 5004 South Justine Street. Kienzle testified that he went into the boarded-up four-flat around midnight for the purpose of conducting narcotics surveillance, and as he was "clearing" the location, he saw Johnson's body by the light of his flashlight. Johnson's body was on the floor with one of her legs propped up against a wall. She was naked below the waist with her underwear around her ankles, and her blouse was pulled up, exposing her breasts. There was blood around her nose and mouth. Mitra Kalelkar, the deputy chief medical examiner of Cook County, testifying on behalf of the State as an expert in forensic pathology, stated that she performed the autopsy on Johnson. Kalelkar found that there had been hemorrhaging in Johnson's right neck muscles and upper esophagus, as well as petechial hemorrhaging in the larynx, trachea, and eyelids. In addition, Kalelkar noted a bite mark on Johnson's tongue. In addition to various abrasions and bruises on her neck, elbows, knees, wrist, and shoulder, Kalelkar also observed a "faint" bruise on the left side of her neck, but no evidence of a ligature mark around the neck. Based upon these injuries, Kalelkar opined that Johnson died of manual, and not ligature, strangulation. Finally, Kalelkar obtained oral, vaginal, and rectal swabs, which were forwarded for further analysis.

¶ 72        Forensic scientist Wenk examined the DNA on the vaginal swab using the RFLP protocol, and found that the DNA from Johnson's vaginal swab "matche[d]" defendant's DNA. Wenk reiterated that the DNA profile obtained from the vaginal swab would be expected to occur in "approximately one in 30 billion blacks, one in 10 billion Caucasians, or one in 22 billion Hispanics." In Wenk's opinion, and within a reasonable degree of scientific certainty, the semen obtained from Johnson's vaginal swab was consistent with having originated from defendant.[5]

¶ 73        Defendant's video-recorded confession was played for the jury. Defendant said that he met Johnson near the intersection of West 50th Street and South Marshfield Street in the afternoon during the third week of April 1999. Defendant said he and Johnson agreed to exchange drugs for sex, which they had done in the past, and walked east to an abandoned house near South Justine Street. They went in through a side door and then up to the second floor, where they went to the back bedroom. Defendant agreed to give Johnson a "hit" of cocaine before she began performing oral sex on him. Johnson then stopped while she was performing oral sex on defendant and demanded more cocaine before continuing. Defendant said he became angry and then leaned over and strangled her. She resisted for about a minute, but then stopped moving.

---

[5]Wenk's cross-examination and redirect examination are discussed *supra* ¶¶ 46-47.

¶ 74    Defendant then took her pants partially off and had vaginal sex with her body until he ejaculated inside of her. Afterwards, he turned her over and had anal sex with her, again ejaculating. Defendant collected her shoes, pants, and purse, and left the house. He discarded the items and smoked his cocaine. At that point, he returned to the scene. He again had vaginal, and then anal, sex with Johnson's body, ejaculating both times. After he finished, defendant said that he dragged Johnson's body to the front bedroom and "slung" her body into the bedroom. Defendant said that Johnson's torso was on the floor and her feet were up against the wall. He then left to go to work.

¶ 75                              I. Claudia R. (No. 00 CR 5457)

¶ 76    Claudia R. testified at trial that, on November 27, 1997, she and her sister Barbara had left their family's Thanksgiving dinner and went to a friend's house near the intersection of West 53rd Street and South Honore Street. Claudia stated that she borrowed $10 from her sister so that she could split a "dime bag" of crack cocaine with her cousin. Claudia said they smoked the crack, and Claudia started walking east along West 51st Street to a bus stop on South Halsted Street. She saw an individual, whom she identified in court as defendant, following her. Defendant walked up to her and asked her if she got "high." Claudia said she did, and defendant said he had two bags, but when defendant reached into his pocket, he pulled out a knife, put it to Claudia's neck, and told her not to scream. They then walked to an abandoned building at West 51st Street and South Peoria Street, where they entered the building through the side and went to the front part of the building.

¶ 77    Claudia R. said that defendant made her remove her clothes, but she tried to escape. Defendant, however, chased her and caught her after pushing a freezer on top of her. Claudia said another woman walked up to the side door of the building and "squatted down to use the bathroom," and Claudia screamed for help and that she was being raped. Defendant told this other woman that Claudia was lying and that Claudia had taken defendant's money. The other woman quickly left.

¶ 78    Defendant then took Claudia into the "next part" of the building, and raped her anally and then vaginally while he held a knife to her throat. Claudia stated that she grabbed the knife, cutting her fingers. The blade broke free of the handle, and she threw the blade. Defendant then wrapped what Claudia believed to be a telephone cord around her neck, and Claudia lost consciousness.

¶ 79    When she regained consciousness, she heard defendant walk up to her and say, "Oh, you one of them bad bitches." Defendant then took a two-by-four and struck her repeatedly about the head. Claudia used her hands to try and block the blows, and she said that the beating removed the skin from the top of her hands. Claudia said she required 52 stitches to her head, and her arms, legs, and wrists were broken. She added that she heard her leg breaking as defendant struck her. At one point, defendant hit her on the kneecap, and Claudia jumped up, but immediately fell back onto her back. Defendant then walked up to her, and while Claudia "played dead," defendant covered her with a mattress. She heard defendant eventually leave the building, and then "scooted out" on her back because she was unable to walk. When she got out of the building, she screamed for help. She required over three months of hospitalization.

¶ 80    On cross-examination, Claudia denied that she was a prostitute, conceding that she had been arrested "for a lot of things." Claudia stated, "[in November 1997,] I got picked up for possession, and they called it what they wanted, but I have never been a prostitute." The parties, however, later stipulated that Claudia R. had been arrested for prostitution on November 14, 1997, approximately two weeks before the attack.

¶ 81    Brenda Armond testified that, at around midnight on November 28, 1997, she saw a young woman screaming for help and crying out that she had been raped. Armond went to a liquor store nearby and told them to call the police. Armond then returned to Claudia, whom Armond described as bloody and naked from the waist down. The police subsequently arrived and took Claudia to the hospital, but one of the responding officers said that Claudia's hands were "completely mangled." The officer further testified, "The one leg was completely mangled," and "It looked twisted so you could not see her knee, you could not see her kneecap." Claudia was then taken to the hospital.

¶ 82    Dr. Lisa Palivos testified that she treated Claudia's injuries. Palivos noted that Claudia suffered from multiple lacerations and broken bones. Palivos stated that her left lower leg bones were fractured, her cheekbone was broken, and there were multiple fractures on her wrists and right hand. As to lacerations, Palivos observed a "huge" laceration of five to six centimeters on the right side of her forehead, a large laceration on her neck, as well as lacerations on her scalp and wrists. Palivos also performed a "rape kit," which included obtaining oral, vaginal, and rectal swabs. Those swabs were subsequently turned over to the police for analysis.

¶ 83    Joanna Wenk, who analyzed the DNA on the vaginal and rectal swabs using the RFLP protocol, testified that the DNA from Claudia R.'s swabs "matche[d]" defendant's DNA. According to Wenk, the DNA profile obtained from the swabs would be expected to occur in "approximately one in 30 billion blacks, one in 10 billion Caucasians, or one in 22 billion Hispanics." Wenk's opinion, within a reasonable degree of scientific certainty, was that the semen obtained from Claudia R.'s vaginal and rectal swabs was consistent with having originated from defendant.[6]

¶ 84    The jury also heard defendant's video-recorded statement. Defendant said he met Claudia near the intersection of West 52nd Street and South Halsted Street on November 27, 1997. He said they had never met before, but Claudia asked whether defendant had any drugs he would trade in exchange for sex. Defendant agreed, and the two of them walked west to South Peoria Street, where they found an abandoned store. They walked into the back of the store and went to the front. Defendant said that Claudia refused sex until she got high. Defendant then threw her onto a table, but another woman came in to urinate, and Claudia "started hollering rape, help me." Defendant said the other woman quickly left, and he grabbed a knife that was nearby and held it to Claudia's head. Claudia grabbed the beer bottle defendant had in his hand and tried to hit him with it, but she missed. Defendant then took her to the back of the building to "beat[ ] her up a little bit."

---

[6]Wenk's cross-examination and redirect examination are discussed *supra* ¶¶ 46-47.

¶ 85     At the back of the building, defendant took off Claudia's clothes and started vaginally raping her. While this was happening another person walked by the building, and Claudia screamed that she was being raped. Defendant pressed the knife to her head, and the blade broke off. After defendant ejaculated, he anally raped her. When he finished, Claudia again started screaming for help and that she had been raped. Defendant took a nearby two-by-four that was about three feet long and started hitting her across the head with it. Defendant said Claudia held up her hands and continued screaming. Defendant then said he "decided to hit her in the rib cage and that knocked the wind out of her." Defendant told Claudia she was lucky defendant did not kill her. Just before leaving, defendant saw that she was "totally naked" and that it was cold outside, so defendant put some "material" on top of her and a piece of plywood in the doorway, both to keep the "wind off of her." Defendant said that, once he was outside, however, "I heard [Claudia] hollering again" for help and that she had been raped. Defendant then took the plywood from the doorway and went back in.

¶ 86     He went to where Claudia lay, removed the debris that he had placed over her, hit her, and warned her that he could have killed her. Defendant said that, when he struck her leg, he heard a "crack[ing]" sound. At that point, defendant said Claudia's screams were muffled. Defendant again warned her that if she continued screaming, he would continue to beat her until she was dead. Claudia stopped screaming, and defendant "threw the debris back on top of her." Defendant then put the plywood back on the door, and left with Claudia's leather coat. He walked to a bus stop on Halsted and took the bus to work, leaving Claudia's leather coat onboard.

¶ 87                        J. The Remaining Five Victims

¶ 88     The jury also heard defendant's video statements with respect to the remaining five victims:[7] Tommie Dennis (No. 00 CR 5455), Shaguanta Langley (No. 00 CR 5456), Patricia Dunn (No. 00 CR 5458), Sonji Brandon (No. 00 CR 5459), and Constance Bailey (No. 00 CR 5463). In each of the cases, defendant stated that he and the women agreed to exchange drugs for sex. Defendant stated that the women, however, each insisted on using defendant's cocaine first, which made defendant angry, so he killed them. Defendant stated he would have sex with their bodies, leave when he was finished, smoke some crack cocaine, and then return to have sex with the bodies a second time.

¶ 89     Mary Greer-Ritzheimer, a forensic scientist with the Illinois State Police, testified that she analyzed the semen found on a burlap bag found between Dunn's legs and the semen on the vaginal swabs taken from Bailey. Greer-Ritzheimer said that she used the "Polymerase Chain Reaction-Short Tandem Repeat" (PCR-STR) method of DNA analysis, and found that the semen from the burlap bag and the vaginal swab "matche[d]" defendant's DNA. Greer-Ritzheimer further testified that she would expect the profile found on the burlap bag and vaginal swab to occur in "approximately one in 110 trillion black, one in 350 trillion white, or one in 420 trillion Hispanic unrelated individuals."

---

[7]Defendant does not raise a specific challenge to the evidence in these five cases.

¶ 90    On cross-examination, Greer-Ritzheimer explained that she calculated the frequencies by taking "an allele frequency[, which] is just a name for a DNA type[,] *** times itself at each location of DNA that you look at," and that with PCR-STR testing, she examined 13 different areas. In addition, when defense counsel asked her whether "STR is more discerning," Greer-Ritzheimer responded, "It can be more discriminating because we can look at more areas of the DNA."

¶ 91                              K. Closing Arguments and Sentencing

¶ 92    The trial court then admonished the jury that closing arguments were not evidence, that they were "merely their commentary, their take that they wish you to adopt." The State's initial closing argument to the jury spans nearly 50 pages of the transcript. During defendant's closing argument, defense counsel challenged the State's evidence with respect to King's murder, noting in particular Geralds' prior confession and the absence of a knife blade in King's back, despite defendant's claim that he stabbed King and the blade broke off in her back. In addition, defense counsel noted that in the five cases Geralds had been convicted of, DNA linked four of them, and the fifth case (Rhonda King) was the one that was subsequently vacated and that defendant was charged with. Defense counsel then commented that, of the 12 cases that defendant was charged with, 8 were linked by DNA and 4 were not. Defense counsel further challenged the DNA evidence by arguing that, since the victims were prostitutes, there should have been more than one male DNA profile found in them. Defense counsel reiterated, "You have 12 women who are prostitutes, only one man's DNA. It is suspect. It is suspect. Why are there not any[ ]more DNA profiles?"

¶ 93    The State then argued in rebuttal. Among the 26 pages comprising the State's rebuttal argument, the State argued that there was no evidence that the "integrity" of the physical evidence had been compromised. The State continued:

"MR. McKAY [the State]: It's the defendant's DNA. It's his DNA. It's his genetic code that separates him from everybody else in the world regardless of color.

MR. KENNELLY [defense counsel]: Objection, Judge.

THE COURT: Overruled.

MR. McKAY: It separates him from his siblings. We all have this unique genetic code ***. And unless we have identical twins, nobody else has our genetic code.

And since the population of the earth is either 6 billion or 8 billion, the chance of finding this unique genetic code that those scientists found when they testified, the chance of doing that, folks, we would have to get in a rocket ship and–

MS. SEATON [defense counsel]: Objection.

MR. KENNELLY: Misrepresentation of the testimony of their own experts.

THE COURT: Overruled. ***

MR. McKAY: We would have to leave this planet *** and find a planet that not only has human beings on it, but has more human beings than this planet does now, five to seven times more.
                                    * * *

- 22 -

*** All of these detailed videotaped statements coupled with DNA evidence is overwhelming evidence of guilt.

* * *

You watched him tell Margaret Wood how he killed and raped 11 women and how he almost killed, but did rape a 12th. He said all these things *** before the DNA comparison came back. Everything he said *** was corroborated after the fact, not before."

¶ 94    At the conclusion of closing arguments, the trial court instructed the jury. Among its instructions, the trial court informed the jury that opening statements were made by the attorneys to acquaint the jury with the facts they expected to be proved. The trial court added that the attorneys' closing arguments were made to discuss the facts and circumstances in the case, and should be confined to the evidence and the reasonable inferences to be drawn from the evidence. The trial court reiterated that neither opening statements nor closing arguments were evidence, and any statement or argument made by the attorneys which was not based on the evidence should be disregarded. At the conclusion of jury instructions, the jury retired to deliberate.

¶ 95    Following deliberations, the jury found defendant guilty of all counts. Specifically, defendant was found guilty of: (a) both counts of attempted murder as to Claudia R.; (b) three counts of first degree murder as to the remaining 11 victims; (c) 4 counts of aggravated criminal sexual assault as to Claudia R., Langley, Townsend, Dennis, Johnson, Bailey, and Brandon; (d) 16 counts of aggravated criminal sexual assault as to Cross; and (e) 8 counts of aggravated criminal sexual assault as to Harris. The jury also found defendant eligible for the death penalty, but its verdict as to the penalty phase stated that a sentence of death was not the appropriate sentence and that, instead, the trial court "shall sentence defendant to natural life imprisonment." With respect to Claudia R., the trial court merged the two attempted murder convictions into one conviction and the four aggravated criminal sexual assault convictions into two separate convictions. Regarding Dunn, King, and Shatteen, the trial court merged the three first degree murder convictions for each of the victims into one conviction each. As to the remaining victims, the trial court merged the three first degree murder convictions and the various aggravated criminal sexual assault convictions into one murder conviction and two aggravated criminal sexual assault convictions for each victim. The trial court subsequently sentenced defendant to natural life for the murders and also imposed 30-year terms of imprisonment for the aggravated criminal sexual assault convictions, and another 30-year term for the attempted murder of Claudia R.

¶ 96                                L. Posttrial Proceedings

¶ 97    Defendant subsequently filed an amended posttrial motion, contending in part that the trial court erred in denying its *Batson* objection during *voir dire*. Defendant argued that the State struck African-American members of the jury venire for purely racial reasons, specifically, Lois Marshall, Wally Payton, Amber Ross-Garrett, and Norman Phillips. On this point, the motion contained no further argument. At the hearing on defendant's motion, defendant did

not present any argument on the motion, and the State rested on its prior arguments. The trial court denied the motion.

¶ 98    This appeal follows.

¶ 99                                II. ANALYSIS

¶ 100                             A. *Batson* Claim

¶ 101    Defendant first contends that, following his objection based upon *Batson v. Kentucky*, 476 U.S. 79 (1986), the trial court conducted an improper *Batson* hearing when it denied defendant's request to rebut the State's race-neutral reason for striking a black prospective juror, Lois Marshall. Defendant asks that we remand this case "for a proper hearing" under *Batson*. The State responds that defendant has forfeited this claim, and waiver aside, the trial court's finding was correct.

¶ 102    It is well established that the State's use of a peremptory challenge to exclude a prospective juror solely on the basis of his or her race violates a defendant's fourteenth amendment right to the equal protection of the laws. *Id.* at 84. In *Batson*, the Supreme Court established a three-step procedure to determine whether the State's use of a peremptory challenge was improperly based upon race. *People v. Allen*, 401 Ill. App. 3d 840, 847 (2010). First, the trial court must determine whether the defendant has made a *prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of race. *Rice v. Collins*, 546 U.S. 333, 338 (2006) (citing *Batson*, 476 U.S. at 96-97). If the showing is made, the matter proceeds to the second step, where the burden shifts to the State to present a race-neutral explanation for striking the juror in question. *Id.* (citing *Batson*, 476 U.S. at 97-98). "Although the prosecutor must present a comprehensible reason, '[t]he second step of this process does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices." *Id.* (quoting *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) (*per curiam*)). At the third and final step, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.* (citing *Batson*, 476 U.S. at 98).

¶ 103    This third step of the *Batson* inquiry "involves an evaluation of the prosecutor's credibility [citation] and 'the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge.' " *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (quoting *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (plurality op.)). "The trial court has a pivotal role in evaluating *Batson* claims." *Id.* This is because the State's race-neutral reasons for peremptory challenges often involve a juror's demeanor, such as nervousness or inattention, which makes the trial court's "firsthand observations of even greater importance." *Id.* The trial court must then evaluate the demeanor of not only the prosecutor (to determine whether the demeanor belies a discriminatory intent), but also the juror (to determine whether the demeanor arguably exhibited the claimed basis for the strike). Both of these determinations lie " 'peculiarly within a trial judge's province.' " *Hernandez*, 500 U.S. at 365 (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)). For this reason, a reviewing court must defer to the trial court absent "exceptional circumstances." *Id.* at 366. Consequently, we must uphold a trial court's ruling on the issue of discriminatory intent unless it is clearly erroneous. *Snyder*, 552 U.S. at 477. Under this standard, we may not reverse unless we are left with a definite and

- 24 -

firm conviction that a mistake has been committed. *Hernandez*, 500 U.S. at 369. In essence, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 574 (1985).

¶ 104    The defendant asserting a *Batson* violation bears the burden of preserving the record. *People v. Johnson*, 183 Ill. 2d 176, 190 (1998) (citing *People v. Hudson*, 157 Ill. 2d 401, 428 (1993)), *cert. denied*, 526 U.S. 1009 (1999). "For a meaningful appellate review of the issue, the record must disclose the race of the venirepersons." *Id.* (citing *People v. McDonald*, 125 Ill. 2d 182, 194-95 (1988)). If there are any ambiguities in the record as to this issue, they are construed against the appellant (here, defendant). *Id.* (citing *Hudson*, 157 Ill. 2d at 428).

¶ 105    At the outset, defendant asserts that the trial court erred in denying him the opportunity to rebut the State's race-neutral explanation of its peremptory challenge of prospective juror Marshall. Defendant argues that, instead of following the proper procedure, the trial court collapsed the process into two steps, in finding no *Batson* violation after the State proffered its race-neutral explanations. For the following reasons, defendant's claim is without merit.

¶ 106    As noted above, at the third step of the *Batson* analysis, the trial court evaluates the prosecutor's credibility to determine whether the defendant has met his burden. *Snyder*, 552 U.S. at 477 (quoting *Hernandez*, 500 U.S. at 365); *Rice*, 546 U.S. at 338 (citing *Batson*, 476 U.S. at 98). Defendant's claim that he had a "right" to rebut the State's proffered race-neutral reason rests upon an erroneous reading of *People v. Mitchell*, 152 Ill. 2d 274, 288 (1992). In *Mitchell*, our supreme court did not hold that, following the State's proffer of a race-neutral explanation for a peremptory challenge, a defendant is entitled to rebut the State's argument. Instead, *Mitchell* held, "After this [the State's race-neutral explanation], defense counsel *may* rebut the prosecutor's reasons as being pretextual." (Emphasis added.) *Id.* This is consistent with *Batson*, which explained the three-step procedure as follows: "[First] the defendant makes a *prima facie* showing; [next,] the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. *** The trial court then will have the duty to determine if the defendant has established purposeful discrimination.*" (Emphasis added.) *Batson*, 476 U.S. at 97-98. *Batson* does not state that a trial court is always required to provide a defendant with an opportunity to rebut the State's argument. The trial court in this case had asked defendant's trial attorneys for something "more specific, that her background, her statistics, her status is similar to Caucasian jurors who have been seated" in response to defense counsel's claim that Marshall gave "no answers significantly or substantially different from white jurors" that the State had accepted. Defense counsel, however, provided nothing; he merely repeated his argument regarding the number of peremptory challenges the State exercised against purportedly black jurors.[8]

¶ 107    Nonetheless, defendant asserts in reply that the trial court "would have benefitted from the defense refreshing its memory" as to Marshall's responses and those of nonminority jurors the State accepted. Defendant's assertion is problematic for several reasons. First, there is nothing

---

[8]Notably, defendant's trial attorneys failed to provide this information in their written motion for a new trial or during argument at the hearing on defendant's motion.

in the record–indeed, defendant points to nothing–that would indicate the trial court had any lapse of memory concerning a potential juror's response. Second, at the hearing on his motion for a new trial, defendant's trial attorneys made no argument and only elected to stand on their written motion, which did not provide the names of nonminority potential jurors who gave similar responses to Marshall but whom the State accepted. As discussed, a defendant asserting a *Batson* violation has the burden of preserving the record, which must disclose the race of the potential jurors, and any ambiguities in the record must be construed against the defendant. *Johnson*, 183 Ill. 2d at 190. Finally, defendant's argument implicitly concedes that there was nothing new to be added in any subsequent rebuttal: defendant was going to merely recount the potential jurors' responses, which the trial court had already heard. Although the supreme court has long held that "a defendant generally should be permitted to offer evidence to rebut the prosecution's explanations for the exercise of peremptory challenges," where, as here, the trial court was present at and presided over the *voir dire* and had the opportunity to observe the prospective juror's demeanor directly, it is not error to deny a defendant's request to rebut the State's explanation. *People v. Young*, 128 Ill. 2d 1, 27-28 (1989), *cert. denied*, 497 U.S. 1031 (1990). Consequently, defendant's claim fails.

¶ 108    Moreover, defendant's citations to *People v. Davis*, 231 Ill. 2d 349, 363 (2008), and *Mack v. Anderson*, 371 Ill. App. 3d 36, 60 (2006), do not support his claim. At the outset, *Davis* is factually distinguishable. There, the trial court held a *Batson* hearing off the record, and therefore, the supreme court did not know what defense counsel argued; instead, the record reflected the trial court's request that the State provide an explanation for its challenge to a prospective juror "without a 'formal' objection by defense counsel." *Davis*, 231 Ill. 2d at 366. Here, by contrast, there was a formal objection by defense counsel and the hearing was on the record. To the contrary, the record reveals the lack of an argument by defense counsel despite a specific request from the trial court to provide additional detail to substantiate its *Batson* objection.

¶ 109    *Mack* is also factually distinguishable. In *Mack*, defense counsel exercised a peremptory challenge against various black members of the venire, including individuals named Stewart, Sims, and Collins. *Mack*, 371 Ill. App. 3d at 39. The plaintiffs objected under *Batson*, and the defendants responded that they peremptorily challenged the three jurors because: (1) each had nodded his head when the discussion turned to the issue of damages, (2) Sims appeared disinterested, and (3) Collins stated she had been a party to a workers' compensation case, which defense counsel believed made Collins a "very litigious person." *Id.* at 40-41. The trial court denied the plaintiffs' *Batson* motion. *Id.* at 41-42. On appeal, this court noted, however, that (1) all of the potential jurors nodded their heads in response to the discussion regarding damages, (2) defense counsel did not make a record by providing a clear and reasonably specific explanation of what he perceived to be Sims's disinterested behavior, and (3) Collins had only been involved in one lawsuit and the record was devoid of support for defense counsel's claim that Collins considered her participation in that lawsuit to be a positive thing. *Id.* at 48-54. This court ordered a new trial. *Id.* at 55.

¶ 110    In this case, however, the record is sufficient to support the State's race-neutral explanation for its peremptory challenge of Marshall. During the *Witherspoon* portion of *voir dire*,

Marshall repeatedly responded that she did not "believe" in the death penalty, and when the trial court asked her whether she could sign a verdict imposing the death penalty, Marshall could only respond, "I believe so." Thus, although Marshall responded to the State's question that she would not "automatically" vote for a life sentence, the State's explanation did not have to "rise to the level *** of a challenge for cause"; it only had to be "clear and reasonably specific," containing legitimate reasons for exercising the challenge, and "related to the particular case to be tried." (Internal quotation marks omitted.) *Batson*, 476 U.S. at 97, 98 & n.20. Here, the State's explanation met these requirements, and since there are two permissible views of this evidence, the trial court's choice cannot be clearly erroneous. *Anderson*, 470 U.S. at 574. As a result, defendant's reliance upon *Mack* is unavailing.

¶ 111                     B. Sufficiency of the Evidence Claim Regarding Rhonda King

¶ 112     Defendant next contends that the State failed to prove him guilty of murdering Rhonda King beyond a reasonable doubt. Defendant's contention is predicated upon two grounds: first, that "the only evidence" of defendant's guilt was his confession, which defendant claims conflicted with the physical evidence; and second, that another individual, Hubert Geralds, had previously confessed to, and was convicted of, the murder.

¶ 113     When presented with a challenge to the sufficiency of the evidence, this court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. De Filippo*, 235 Ill. 2d 377, 384-85 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is not the function of this court to retry the defendant. *People v. Evans*, 209 Ill. 2d 194, 209 (2004). Rather, it is for the trier of fact to assess the credibility of the witnesses, determine the appropriate weight of the testimony, and resolve conflicts or inconsistencies in the evidence. *Id.* at 211. As a result, mere allegations that a witness was not credible will not justify reversal. *Id.* at 211-12; see also *People v. Manning*, 182 Ill. 2d 193, 211 (1998) (rejecting a similar challenge based upon "speculation that another person might have committed the offense"). In essence, this court will not reverse a conviction unless the evidence is "so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of defendant's guilt." *Evans*, 209 Ill. 2d at 209.

¶ 114     The *corpus delicti* of an offense is simply the commission of a crime, which (along with the identity of the offender) is one of two propositions the State must prove beyond a reasonable doubt. *People v. Lara*, 2012 IL 112370, ¶ 17. As a general rule, the *corpus delicti* cannot be proven solely by a defendant's admission, confession, or out-of-court statement alone; rather, the State must also provide independent corroborating evidence. *Id.* (citing *People v. Sargent*, 239 Ill. 2d 166, 183 (2010)). The *Lara* court further explained:

> "To avoid running afoul of the *corpus delicti* rule, the independent evidence need only *tend to show* the commission of a crime. It need not be so strong that it alone proves the commission of the charged offense beyond a reasonable doubt. If the corroborating evidence is sufficient, it may be considered, together with the defendant's confession, to determine if the State has sufficiently established the *corpus delicti* to support a conviction." (Emphasis in original.) *Id.* ¶ 18.

¶ 115   The *Lara* court further noted that it had affirmed a defendant's sexual assault conviction "*in the absence of direct evidence of penetration.*" (Emphasis in original.) *Id.* ¶ 33 (citing *People v. Bounds*, 171 Ill. 2d 1 (1995)). In *Bounds*, the defendant confessed to killing the victim after kidnapping and sexually assaulting her. *Bounds*, 171 Ill. 2d at 43. The defendant argued that there was insufficient evidence of an act of intercourse because there was no physical evidence, such as the presence of semen or trauma to the victim's vaginal area, but the supreme court rejected the defendant's claim. *Id.* at 44. The court noted that the victim was found naked from the waist down, and that the forensic pathologist testified that the absence of trauma did not necessarily rule out nonconsensual intercourse. *Id.* The court concluded, "While not conclusive proof that an act of penetration occurred, the undressed condition of the body tended to show that the victim was sexually assaulted and corroborated the defendant's description of the attack." *Id.*

¶ 116   Turning to the case before us, we hold that the evidence independent of defendant's confession was sufficient to support his conviction for the murder and aggravated sexual assault of King. As in *Bounds*, the circumstances of how King was found suggests that she had been sexually assaulted and stabbed (as defendant confessed), rather than simply strangled (as Geralds confessed). The bloodstain that was two feet from her head and her bloodstained clothes tend to corroborate both (a) stabbing rather than strangulation as the cause of death and (b) that her body was moved, which defendant's confession stated but Geralds' did not. Finally, similar to the *Bounds* victim, King was found naked from the waist down. Given these facts, we hold that the State's independent evidence "*tend[ed] to show* the commission of a crime." (Emphasis in original.) *Lara*, 2012 IL 112370, ¶ 18. Thus, the State proved the *corpus delicti* beyond a reasonable doubt.

¶ 117   Although no knife blade was recovered, no hyoid bone (which could substantiate death by strangulation) was found, either. Evidence at trial indicated that there was rodent and dog feces near the body, and there were indications that the body had been partially eaten. There was also testimony about possible animal predation, in which animals would remove the tissues–and whatever they are attached to, such as a hyoid bone or knife blade–and scatter the attached materials elsewhere. In any event, it is not this court's function to retry defendant. *Evans*, 209 Ill. 2d at 209. It is within the province of the jury to assess the credibility of the witnesses, determine the appropriate weight of the testimony, and resolve conflicts or inconsistencies in the evidence. *Id.* at 211.

¶ 118   Finally, it is undisputed that the State tried and convicted another individual, Hubert Geralds, for King's murder. Geralds was sentenced to death, but the State later moved to vacate his conviction and sentence. We find this series of events extraordinarily troubling. Nonetheless, viewing the evidence in this case in the light most favorable to the State, as we must (*De Filippo*, 235 Ill. 2d at 384-85), the State's independent evidence tended to corroborate defendant's confession. We note in particular that Geralds' statement did not provide substantial detail regarding King's murder, and the jury may have reasonably found it less credible than defendant's video-recorded confession. Geralds' statement indicated that he met King at the intersection of West 54th Street and South Morgan Street, and after purchasing crack cocaine from her and agreeing to smoke crack cocaine together, they decided to walk 0.6

- 28 -

miles to the abandoned building where Geralds claimed to have killed her.[9] By contrast, defendant's video statement indicated that he met King at the intersection of West 50th Place and South Halsted Street, about 0.1 miles from the location where King's body was found. Geralds further wrote in his statement that he did not have sex with her, but he removed her clothes to make it look like a rape. Defendant, however, freely admitted to having twice had vaginal and anal sex with her body. Although Geralds wrote on the back of King's photograph that he choked her, notably absent from his statement was any sort of physical description of King. Defendant provided a detailed description of King, which obviated the need for a photographic identification. Finally, as noted above, the circumstances under which King was found tended to corroborate defendant's confession that he stabbed King and then had vaginal and anal sex with her body.

¶ 119    Moreover, defendant's reliance upon *People v. Wright*, 147 Ill. App. 3d 302 (1986), and *People v. Kent*, 111 Ill. App. 3d 733 (1982), is misplaced. In *Wright*, the defendant was convicted, *inter alia*, for rape. *Wright*, 147 Ill. App. 3d at 303. The defendant did not confess, and the complaining witness's testimony, we held, had "greater value as fiction than as credible evidence." *Id.* at 318. We further noted that the hospital physician's examination of the complainant revealed only skin inflammation on her back, but we found that the "horizontal skin inflammation on [her] back could have occurred if the intercourse was consensual. The same is true regarding the abrasions on [her] vagina discovered by the examining physician." *Id.* at 320-21. In addition, she had no other bruises or injuries (not even on her wrist, where the defendant allegedly held her continuously) despite her claim that she was pulled, pushed and shoved throughout various locations for over four hours. *Id.* at 321. Finally, no evidence was produced indicating that she had torn or ripped clothing, again despite her claim that she and the defendant fought on a school playground.    *Id.* Consequently, we reversed the defendant's convictions. *Id.* at 322.

¶ 120    In *Kent*, the defendant was convicted of the murder of her four-month-old daughter by feeding her alcohol. *Kent*, 111 Ill. App. 3d at 733. We held, however, that the evidence was insufficient to prove the defendant's guilt beyond a reasonable doubt. *Id.* at 738. We noted that all of the expert witnesses, including the State's, testified that sudden infant death syndrome, Reyes syndrome, or malnutrition could have caused the physical conditions found during the autopsy, and the decedent's being ill with a fever the day before her death supported a theory that an illness, rather than alcohol intoxication, was the cause of death. *Id.* We further noted that the medical examiner's office did not perform the "Mallory test," which would have "conclusively established whether alcoholism, rather than one of the aforementioned diseases, was a significant contributing cause of death." *Id.* at 738-39. We further noted the significant evidence that the presence of ethanol could have been produced by decomposition because the

---

[9]We determined this distance by querying the Google Maps website for walking directions from the intersection where Geralds allegedly met King to the location where her body was found. This court may take judicial notice of information on a public website even though the information was not in the record on appeal. See *People v. Clark*, 406 Ill. App. 3d 622, 633-34 (2010) (reliability of "mainstream Internet sites" such as MapQuest and Google Maps warrant judicial notice).

time of death was never determined and could have occurred nearly 12 hours before the decedent was taken to the morgue. *Id.* at 739. Finally, the liquid Tylenol given to the child the day before her death had more alcohol in it "than most domestic beers," and the amount consumed and its effect were never proved, but a defense expert testified that, based upon experiments performed on small animals, small quantities of alcohol had little or no adverse effects. *Id.*

¶ 121    Here, unlike *Wright*, the physical evidence did not suffer the same infirmities. As noted above, the victim was found naked from the waist down, a pool of blood was within two feet of her head and her jacket, which was underneath her partially skeletonized and mummified remains, was bloodstained. In contrast to *Kent*, there was evidence in addition to the autopsy report that sufficiently corroborated defendant's video-recorded confession. We therefore reject defendant's reliance upon *Wright* and *Kent*, and his claim of error on this point is without merit.

¶ 122                    C. Due Process Claim With Respect to the DNA Evidence

¶ 123    Defendant's third contention on appeal is that he was denied a fair trial on two grounds. First, defendant argues that his trial attorneys rendered ineffective assistance when they failed to convey to the jury "the insignificance of a [DNA] match" at only five loci with respect to the following six victims: Nicole Townsend (discussed *supra* ¶¶ 41-49), Angela Shatteen (*supra* ¶¶ 51-56), Evandre Harris (*supra* ¶¶ 58-61), Cheryl Cross (*supra* ¶¶ 63-69), Sheryl Johnson (*supra* ¶¶ 71-74), and Claudia R. (*supra* ¶¶ 76-87). Second, defendant also argues that the State improperly claimed in its opening statement and rebuttal closing argument that the DNA recovered from those victims was defendant's. Defendant concludes that the cumulative effect of these errors denied him a fair trial.

¶ 124    At the outset, defendant asks that we take judicial notice of the pretrial deposition of Donald Parker from an unrelated criminal case (People v. Luna, No. 02 CR 15430) that another division of this court ordered supplemented to the record in yet another unrelated criminal case. *People v. Wright*, 2012 IL App (1st) 073106, ¶ 51. The State filed a motion to strike that portion of defendant's brief, and following defendant's response, we ordered the motion taken with the case. For the following reasons, we grant the State's motion, and so we will disregard those portions of defendant's brief that improperly rely upon this unrelated deposition.

¶ 125    We note that the court in *Wright* ordered defendant to supplement the record with those portions of the record in *Luna* that would substantiate the *Wright* defendant's claims that a test run by the Illinois State Police to find the number of apparent matches at 9 or more loci resulted in 903 pairs out of 220,456 offender profiles. *Id.* The *Wright* court cited to *People v. McKown*, 226 Ill. 2d 245, 258-59 (2007), in support of its statement that it may look to outside scientific evidence when evaluating a trial court's ruling on scientific evidence. *McKown* concerned the judicial notice of the general acceptance of the "Horizontal Gaze Nystagmus" (HGN) test. *McKown*, 226 Ill. 2d at 247-48. The *McKown* court, however, found judicial notice *inappropriate* because there was no consensus as to the general acceptance of the HGN test. *Id.* at 272 ("These disparate opinions provide insight as to how HGN testing has been addressed, but do not present the kind of unequivocal or undisputed viewpoint on the issue upon which a

court can take judicial notice. As such, we cannot take judicial notice of the general acceptance of HGN test results based on prior judicial decisions."). Here, the *Luna* expert's deposition was not undisputed, so judicial notice of the substance of that testimony–but not the *fact* that the expert testified–would be inappropriate. We therefore find the holding in *Wright* unpersuasive and decline to follow it.

¶ 126 In addition, defendant points to nothing in the record that the trial court had this evidence before it. Although Greer-Ritzheimer admitted on cross-examination that DNA analysis under PCR was "more discriminating" than analysis under RFLP, there was no testimony relative to the number of nine-or-more loci "matches" within the Illinois offender database. As a result, it would be improper for this court to consider it. See, *e.g.*, *People v. Heaton*, 266 Ill. App. 3d 469, 478 (1994) ("Clearly, however, the trial court was not faced with evidence that Dr. Allen's product-rule method was the subject of debate within the scientific community. Defendant presented no such evidence, and no such evidence is properly before this court on review."). For this additional reason, we grant the State's motion and decline defendant's invitation to take judicial notice of Parker's deposition. We now consider the substantive claims that defendant raises on this issue.

¶ 127                     1. Ineffective assistance of counsel

¶ 128 Defendant first claims that his trial attorneys were ineffective with respect to six of his cases because they did not sufficiently argue the impact of only a 5-loci DNA "match," rather than a 13-loci match. Defendant further claims that "the defense should have presented an expert witness to demonstrate that Olson's reliance on statistical charts was unreliable and to explain why the frequency of the evidentiary profile was not as unique as she suggested."

¶ 129 Both the federal and state constitutions guarantee to criminal defendants the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. To establish a claim of ineffective assistance of counsel, a defendant must show both a deficiency in counsel's performance and prejudice resulting from that deficiency. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (adopting *Strickland*). In other words, under *Strickland*, in order to prevail on a claim of ineffective assistance, defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance so prejudiced the defense as to deny defendant a fair trial. *People v. Nowicki*, 385 Ill. App. 3d 53, 81 (2008) (citing *Strickland*, 466 U.S. at 687).

¶ 130 To show counsel's performance was objectively unreasonable, a defendant must overcome the "strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence." *People v. Coleman*, 183 Ill. 2d 366, 397 (1998). To show prejudice, a defendant must show a reasonable probability, *i.e.*, "a probability sufficient to undermine confidence in the outcome," that, but for defense counsel's deficient performance, the result of the trial would have been different. *Strickland*, 466 U.S. at 694; *People v. Houston*, 226 Ill. 2d 135, 144 (2007). Failure to show either deficient performance or sufficient prejudice defeats an ineffectiveness claim. *Strickland*, 466 U.S. at 687. Matters of trial strategy typically do not support a claim of ineffective assistance of counsel unless

counsel failed to conduct any meaningful adversarial testing. *People v. Patterson*, 217 Ill. 2d 407, 441 (2005). Whether defendant received ineffective assistance of counsel is a mixed question of fact and law. *Strickland*, 466 U.S. at 698. We thus defer to the trial court's findings of fact, but review *de novo* the ultimate legal issue of whether counsel's omission supports an ineffective assistance claim. *People v. Davis*, 353 Ill. App. 3d 790, 794 (2004).

¶ 131　　　Here, defendant has failed to meet either prong of *Strickland*. First, his trial attorneys did not render objectively unreasonable assistance. Contrary to defendant's assertion, his attorneys thoroughly cross-examined Wenk with respect to the impact of a 5-loci match compared to a 13-loci match. In addition, they were successful in eliciting a concession from Greer-Ritzheimer that the STR protocol, which was not used in the six cases at issue here, was more discriminating than the RFLP protocol, which was used. As Greer-Ritzheimer responded, "It [STR] can be more discriminating [than RFLP] because we can look at more areas of the DNA." On this point, defendant cannot overcome "the strong presumption" that his counsel's actions were the product of sound trial strategy and not incompetence. *Coleman*, 183 Ill. 2d at 397.

¶ 132　　　Defendant's contention regarding his attorneys' failure to hire an expert to challenge the frequency calculations is similarly unavailing. Greer-Ritzheimer explained that the frequency calculation was the mathematical product of the frequencies of the individual loci, *i.e.*, that the frequency calculation was based upon the "product rule." See *People v. Miles*, 217 Ill. App. 3d 393, 404-05 (1991) (defining the "product rule"); David H. Kaye & George F. Sensabaugh, Jr., *Reference Guide on DNA Evidence*, Reference Manual on Scientific Evidence 485, 494 (2d ed. 2000) ("At a locus with only twenty such alleles (and most loci typically have many more), there are 210 possible genotypes. With five such loci, the number of possible genotypes is $210^5$, which is more than 400 billion."). The product rule is well accepted in Illinois. See *People v. Almighty Four Hundred*, 287 Ill. App. 3d 123, 130 (1997); *In re Jessica M.*, 399 Ill. App. 3d 730, 745 (2010).

¶ 133　　　On this point, defendant's complaints regarding the failure to argue with respect to an alleged search of the Illinois DNA database that revealed nearly 2,000 profiles that matched at nine loci has been discredited. As defendant's own source explains, these database trawls seek all possible pairs in a database (rather than one specific nine-loci grouping), which result in a staggering number of comparisons. See David H. Kay, *Trawling DNA Databases for Partial Matches: What Is the FBI Afraid Of?*, 19 Cornell J.L. & Pub. Pol'y 145, 157 (2009). For example, if the database for the state of Arizona contains 65,493 entries, a comparison search would produce over 2 billion distinct pairs. *Id.* A search for 9 loci or more out of 13 loci (or, 715 distinct combinations of 9 items out of 13) would produce 1.5 trillion "opportunities to find nine-locus matches" within the Arizona database. *Id.* Applying the same methodology to defendant's asserted claim of 220,456 profiles in the Illinois database would result in 24.3 billion distinct pairs and a corresponding 17.4 *trillion* opportunities to find 9-locus matches out of 13-loci.[10] If, as defendant claims, there were "903 pairs of profiles matching at 9 loci," that

_____

[10]The number of comparisons is calculated as follows: (220,456 x 220,455) ÷ 2 = 24,300,313,740. The number of combinations of 9-loci matches out of 13-loci is: (13!) ÷ (9! x 4!) = 715. The number of

probability would be vanishingly small when compared with 17.4 trillion possible pairs, and trial counsel's argument as to this point would not have been of even arguable merit. Defense counsel is not ineffective for failing to make a fruitless argument. *People v. Edwards*, 195 Ill. 2d 142, 165 (2001). Therefore, defendant's claim does not meet the first prong of *Strickland*.

¶ 134    Moreover, even assuming, *arguendo*, that his trial counsel's performance was objectively unreasonable, defendant's claim fails the prejudice prong. As discussed above, in each of the six cases that defendant complains of this error, defendant provided a video-recorded confession that was amply corroborated by independent evidence. For the sake of brevity, we will not repeat the extensive details in defendant's video statement and the testimony regarding the crime scenes and victims. Based upon the evidence at trial regarding those six victims, we cannot hold that there is a reasonable probability, *i.e.*, "a probability sufficient to undermine confidence in the outcome," that, but for defense counsel's alleged deficient performance, the result of defendant's trial would have been different. *Strickland*, 466 U.S. at 694; *Houston*, 226 Ill. 2d at 144. Defendant therefore cannot establish prejudice under *Strickland*, and his claim is without merit.

¶ 135                      2. The State's comments on the DNA evidence

¶ 136    Defendant also argues that the State's comments improperly bolstered the significance of the DNA analysis when the State argued in its opening statement and its rebuttal closing argument that the DNA from the six victims was defendant's DNA. Defendant argues that the evidence from the five-loci comparison was merely that defendant could not be eliminated as the donor of the semen found on or about the victims. Defendant concludes that these comments denied him a fair trial.

¶ 137    Defendant's claims regarding the State's opening statements are without merit. The statements defendant complains of here on appeal were never objected to, nor were these complaints included in defendant's extensive amended motion for a new trial. Accordingly, they are forfeited. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) ("*Both* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (Emphases in original.)); *People v. Brown*, 185 Ill. 2d 229, 252 (1998) (holding that a challenge to the State's opening statement "must now be considered waived" due to defense counsel's failure to object).

¶ 138    Moreover, forfeiture aside, defendant's contention must be rejected. The purpose of an opening statement is to apprise the jury of what each party expects the evidence to prove, and it may include a discussion of the expected evidence and reasonable inferences therefrom. *People v. Kliner*, 185 Ill. 2d 81, 127 (1998). While it is true that the State may not claim anything in its opening statement that it cannot or does not intend to prove, reversible error only occurs (1) if the State's opening statement is attributable to the "deliberate misconduct of the prosecutor" and also (2) results in "substantial prejudice to the defendant." *Id.* Here,

---

"opportunities" to find a 9-locus match within 13-loci is 24.3 billion multiplied by 715, which equals 17,374,724,324,100. See generally Harold J. Larson, Introduction to Probability Theory and Statistical Inference 40-50 (2d ed. 1974).

defendant cannot meet either prong of this test. Defendant points to nothing in the record to support any claim that the challenged statements were the result of "deliberate" prosecutorial misconduct, and we can find nothing. Second, as stated below, defendant did not suffer substantial prejudice such that, absent the remarks, his verdict would have been different.[11] For this reason, defendant's argument with respect to opening statements is unavailing on this additional ground. We now consider the challenge to the closing arguments.

¶ 139 The State is given considerable latitude in making closing arguments, and it may respond to comments that clearly invite a response. *People v. Hall*, 194 Ill. 2d 305, 346 (2000). "A prosecutor may argue the evidence presented, or reasonable inferences therefrom, even if the inference is unfavorable to the defendant. *People v. Tolliver*, 347 Ill. App. 3d 203, 224-25 (2004) (citing *People v. Hudson*, 157 Ill. 2d 401, 441 (1993)). The State may also respond to comments by the defense that clearly invite a response. *People v. Armstrong*, 183 Ill. 2d 130, 146 (1998). Furthermore, we must review the arguments of both the State and the defense in their entirety, with the challenged portions placed in their proper context. *People v. Cisewski*, 118 Ill. 2d 163, 175-76 (1987). A significant factor in determining the impact of an improper comment on a jury verdict is whether "the comments were brief and isolated in the context of lengthy closing arguments." *People v. Runge*, 234 Ill. 2d 68, 142 (2009). In addition, we must presume, absent a showing to the contrary, that the jury followed the trial judge's instructions in reaching a verdict. *People v. Simms*, 192 Ill. 2d 348, 373 (2000). Finally, even if a prosecutor's closing remarks are improper, "they do not constitute reversible error unless they result in substantial prejudice to the defendant such that absent those remarks the verdict would have been different." *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). Due to an apparent conflict between two supreme court cases, it is unclear what the proper standard of review is when reviewing improper closing arguments. Compare *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007) (*de novo*), with *People v. Blue*, 189 Ill. 2d 99, 128 (2000) (abuse of discretion). We need not resolve this apparent conflict, however: defendant's claim fails under either standard.

¶ 140 Here, the State merely parroted Wenk's testimony that the DNA "matche[d]" defendant. It is not error to recount witness testimony. See *Tolliver*, 347 Ill. App. 3d at 224-25. In addition, defense counsel challenged the DNA evidence in her closing argument, characterizing it as "suspect" because the victims were all prostitutes, but only one male DNA profile was found. The State was therefore entitled to respond to defendant's closing argument. *Armstrong*, 183 Ill. 2d at 146. Moreover, even assuming, *arguendo*, that the State's arguments were improper, defendant did not suffer such substantial prejudice that, absent the comments, the verdict would have been different. As discussed regarding the ineffective assistance of counsel claim above, defendant's video-recorded confessions were sufficiently corroborated by the independent evidence that the State presented regarding the six victims.

---

[11]In a footnote in his reply brief, defendant asserts that the failure to properly preserve this claim is due to ineffective assistance of counsel. Setting aside whether this assertion sufficiently complies with Supreme Court Rule 341 (Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013)), it must be rejected for failure to meet the second prong of *Strickland*. See *supra* ¶ 135.

¶ 141    In addition, the jury was both admonished (immediately before both opening statements and closing arguments) and instructed (immediately following closing arguments) that neither opening statements nor closing arguments were evidence, and to disregard any statement or argument made by the attorneys not based on the evidence. Defendant presents nothing to counter the presumption that the jury followed the trial judge's instructions in reaching a verdict. *Simms*, 192 Ill. 2d at 373. Overall, we cannot hold that, absent the challenged remarks, the verdict would have been different. Hence, even if those remarks were improper, they would not constitute reversible error. *Hudson*, 157 Ill. 2d at 441. Accordingly, defendant's claim is meritless.

¶ 142    Finally, our decision is unaffected by *People v. Linscott*, 142 Ill. 2d 22 (1991), and *People v. Sutherland*, 155 Ill. 2d 1 (1992), on which defendant relies. In *Linscott*, the evidence at trial was that the defendant's hairs were "consistent" with hairs found at the scene of the crime. *Linscott*, 142 Ill. 2d at 29. Notably, the State's witness stated that he could not determine whose head the hair found at the crime scene came from; he only testified that the hair was consistent with the defendant's hair. *Id.* In addition, three witnesses testified that they could not conclusively identify the hairs as coming from the defendant. *Id.* at 30. Nonetheless, the State repeatedly claimed during its closing argument that the defendant's hair was found in the victim's apartment and on her body. *Id.* The supreme court held that, because there was no evidence to support these statements, the prosecution's argument was improper. *Id.*

¶ 143    In *Sutherland*, the State similarly presented forensic witness testimony that 28 gold fibers in the victim's clothing " 'could have originated' " from the defendant's auto carpet, but the witness could not state that the fibers originated from the defendant's auto carpet "to the exclusion of all other auto carpets," and that one remaining gold fiber found on the victim's clothes "could have originated" from the upholstery of the defendant's car. *Sutherland*, 155 Ill. 2d at 10. The State, however, argued in its closing argument that the fibers on the victim's clothing "came from" the defendant's car. *Id.* at 23. In addition, the forensic scientist testified that three polyester fibers found on the front passenger seat and floor of the defendant's car "could have originated" from the victim's shorts. *Id.* at 10. The State, however, argued on three separate occasions during its closing argument that the fibers from the victim's shorts were "found" in the passenger side of the defendant's car. *Id.* at 23. The supreme court found that, although the comments did not warrant a new trial, the State's "overstatement" of the fiber-comparison evidence was improper. *Id.* at 25.

¶ 144    By contrast, here the State simply repeated what Wenk had stated, that the DNA recovered from the various victims' swabs "matche[d]" the defendant's. Also unlike the prosecutor in *Sutherland*, the State's comments were isolated, comprising less than one page of the 26-page transcript of the State's rebuttal closing argument. Since these comments were brief and isolated within a lengthy closing argument, this is a significant factor mitigating against any improper impact on the jury's verdict. See *Runge*, 234 Ill. 2d at 142. As a result, defendant's claim on this point fails.

¶ 145                                D. *Crawford* Claim

¶ 146       Defendant's final contention on appeal is that he was denied his sixth amendment right of confrontation because (1) the contents of the autopsy report as to Nicole Townsend's death were testified to by a substitute medical examiner and not the medical examiner who prepared the report, and (2) the autopsy report was admitted for its substantive proof as to Townsend's death.

¶ 147       The sixth amendment to the United States Constitution, applicable to the states via the fourteenth amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amends. VI, XIV; see also Ill. Const. 1970, art. I, § 8; *Crawford v. Washington*, 541 U.S. 36, 54 (2004); *Pointer v. Texas*, 380 U.S. 400 (1965) (holding that the confrontation clause is applicable to the states via the fourteenth amendment). In *Crawford*, the Supreme Court held that, under the confrontation clause, the testimonial hearsay statements of a witness who is unavailable at trial may not be admitted against a criminal defendant unless the defendant had a prior opportunity for cross-examination. *People v. Patterson*, 217 Ill. 2d 407, 423 (2005) (citing *Crawford*, 541 U.S. at 68). To resolve a claim under *Crawford* requires answers to these questions: "(1) Was the out-of-court statement hearsay because it was offered by for the truth of the matters asserted therein? (2) If hearsay, was the statement admissible under an exception to the hearsay rule? (3) If admissible hearsay, was the statement testimonial in nature? and (4) If testimonial, was admission of the statement reversible error?" *People v. Leach*, 2012 IL 111534, ¶ 63. Whether a defendant's confrontation clause rights were violated presents a question of law; accordingly, our review is *de novo*. *Id.* ¶ 64 (citing *People v. Lovejoy*, 235 Ill. 2d 97, 141-42 (2009)). Finally, "*Crawford* violations are subject to harmless-error analysis." *Patterson*, 217 Ill. 2d at 428.

¶ 148       In *Leach*, the defendant was convicted of the first degree murder in the strangling death of his wife. *Leach*, 2012 IL 111534, ¶¶ 1-3. The autopsy report on the victim was admitted into evidence through the expert testimony of a medical examiner who had not performed the autopsy but had reviewed the autopsy report in forming her opinion on the cause of death. *Id.* ¶ 1. The appellate court affirmed the conviction, and defendant further appealed to the supreme court. *Id.*

¶ 149       The supreme court addressed whether the medical examiner's testimony and the autopsy report she relied upon violated the defendant's confrontation clause rights. *Id.* ¶ 50. The *Leach* court stated that, although the *Crawford* Court "merely noted *** that business records will rarely implicate the confrontation clause because they are prepared in the routine course of the operation of the business activity or public office or agency, rather than for the purpose of admission against a criminal defendant," "[t]his does not mean *** that a business record or public record can never be testimonial." *Id.* ¶ 81.

¶ 150       The *Leach* court then undertook an extensive examination of numerous decisions from the United States Supreme Court on this issue, including *Crawford*, *Davis v. Washington*, 547 U.S. 813, 822 (2006), *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), *Michigan v. Bryant*, 562 U.S. ___, 131 S. Ct. 1143 (2011), *Bullcoming v. New Mexico*, 564 U.S. ___, 131 S. Ct. 2705 (2011), and *Williams v. Illinois*, 567 U.S. ___, 132 S. Ct. 2221 (2012). *Leach*, 2012 IL

111534, ¶¶ 77-135. Noting at one point the need to provide a "scorecard" to reconcile the various plurality opinions, partial concurrences, and partial dissents (*id.* ¶ 105), our supreme court expressed hope that the "split of opinion and \*\*\* confusion \*\*\* may eventually be resolved by the United States Supreme Court" (*id.* ¶ 136). Until that time, the *Leach* court held that "under the objective test set out by the plurality in *Williams* [*i.e.*, whether the primary purpose was to accuse a targeted individual of criminal conduct], under the test adopted in *Davis* [whether the primary purpose was to provide evidence in a criminal trial], and under Justice Thomas's 'formality and solemnity' rule [finding affidavits, depositions, confessions, and prior testimony subject to *Crawford*], autopsy reports prepared by a medical examiner's office in the normal course of its duties are nontestimonial," even those reports that are prepared by a medical examiner who is "aware that police suspect homicide and that a specific individual might be responsible." *Id.* ¶ 136.

¶ 151    In our view, the holding in *Leach* controls this issue. Here, as in *Leach*, Townsend's autopsy report was prepared by Lifschultz, who had retired out of the country by the time of defendant's trial, and Jones, the chief medical examiner, testified as to the contents of the report–which was admitted as evidence at trial–and relied upon that report in formulating her opinion as to Townsend's manner of death. The testimony at trial was that the report was prepared in the normal course of business and not for the sole purpose of litigation. See *id.* ¶ 130. Unlike the forensic report in *Melendez-Diaz* but similar to the autopsy report in *Leach*, the autopsy report in this case was not certified or sworn.[12] See *id.* ¶ 131. Thus, the autopsy report here lacks the "formality and solemnity of an affidavit, deposition, or prior sworn testimony" and does not trigger *Crawford*. *Id.*; see also *Michigan*, 562 U.S. at ___, 131 S. Ct. at 1167 (Thomas, J., concurring in the judgment). As the *Leach* court noted, under state law, the coroner must undertake a preliminary investigation into the circumstances of a decedent's death when certain conditions are present, including " 'sudden or violent death, whether apparently suicidal, homicidal or accidental.' " *Leach*, 2012 IL 111534, ¶ 126 (quoting 55 ILCS 5/3-3013(a) (West 2010)). As such, the primary purpose for the preparation of the autopsy report in this case was to determine the cause of death, and not to accuse a targeted individual of criminal conduct nor to provide evidence at a criminal trial. Since the evidence does not meet the tests set forth in *Williams* and *Davis*, it does not trigger the protections of *Crawford*. Therefore, the trial court did not err in allowing Dr. Jones to testify as to the contents of the autopsy report (even though another medical examiner had prepared it), nor in admitting the autopsy report as evidence.

¶ 152    Although defendant argues that *Leach* is distinguishable because Lifschultz's determination was suspended for about two months, during which time Lifschultz had discussions with police detectives, we disagree with defendant's characterization that the police played a "direct role" in Lifschultz's medical conclusion. Our reading of the evidence is that Lifschultz suspended his determination of the cause of what appeared to be a very suspicious death while he gathered more information, including from police detectives investigating a series of deaths under very similar circumstances as Townsend's. The state law

---

[12]We note, however, that a certified *copy* of the autopsy report was admitted as evidence.

mandating an investigation under these circumstances cannot occur in a vacuum or within the confines of the medical examiner's office. Lifschultz's investigation necessitated additional time for a discussion with police officers. There is no evidence in the record that the police fed Lifschultz (or Jones) information that defendant murdered Townsend. As defendant was not targeted in this report, defendant's contention fails.

¶ 153 Moreover, even assuming, *arguendo*, that the trial court erred, any error was harmless beyond a reasonable doubt, given the evidence at trial. Defendant's video confession provided exact details of: (i) where Townsend's body was found, (ii) the fact that he wiped his semen on "material" next to her body (the DNA analysis on the pantyhose nearby confirmed a "match[ ]" with defendant), (iii) the fact that he threw something on top of her body (she was found with a blanket covering her), and (iv) a sexual assault (which was strongly suggested by the body's appearance, with her pants off of one leg and her bra pushed above her breasts). Therefore, on this additional basis, defendant's final contention of error is meritless.

¶ 154                                    III. CONCLUSION

¶ 155 We hold that remand for a *Batson* hearing is unnecessary because the record supports the State's race-neutral explanation for its peremptory challenge, and defendant did not provide support for his claim either when the trial court requested it or in his posttrial motion. In addition, the evidence of defendant's guilt as to the murder of Rhonda King was sufficient, where the independent evidence tended to corroborate his video-recorded confession. Third, defendant was not denied a fair trial due to his trial attorneys' failure to argue regarding a DNA match at only five loci or due to the State's closing remarks because neither prong under *Strickland* is met and the absence of the State's remarks would not have changed the verdict. Finally, pursuant to the holding in *Leach*, defendant was not denied his confrontation rights when the medical examiner who performed the autopsy did not testify but the report he prepared was recounted to the jury by another medical examiner. Accordingly, we affirm the judgment of the circuit court of Cook County.

¶ 156     Affirmed.