**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 250132-U

Order filed April 13, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellee, | ) | Will County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-25-0132 |
| | ) | Circuit No. 24-DT-531 |
| | ) | |
| MIGUEL A. BAUTISTA FLORES, | ) | Honorable |
| | ) | Judge Colette Safford, |
| Defendant-Appellant. | ) | Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justices Holdridge and Bertani concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*: Defendant forfeited his claim on appeal that the results of his HGN test lacked a proper foundation, and plain-error review was not warranted. Affirmed.

¶ 2     Following a bench trial, defendant, Miguel Bautista Flores, was convicted of driving under the influence (DUI). On appeal, defendant challenges for the first time the admission of his horizontal gaze nystagmus (HGN) test as lacking adequate foundation. Contrary to defendant's argument, plain-error review is not warranted because the evidence apart from the HGN test results was not closely balanced. We affirm.

I. BACKGROUND

¶ 4     On June 21, 2024, defendant was charged by citation with one count of DUI (625 ILCS 5/11-501(a)(2) (West 2024)) and one count of driving with expired license plates (625 ILCS 5/3-413(f) (West 2024)).

¶ 5     At the bench trial, the State called Will County Sheriff's Deputy, Jacob Close, as its first witness. Close testified that, on June 21, 2024, he was dispatched to a residence following the homeowner's report of an unknown vehicle parked in his driveway. The homeowner indicated that an individual "appeared to be passed out behind the wheel." Upon arrival, Close observed a Jeep parked in the driveway behind the residence, but no one was inside the vehicle. Defendant was subsequently found "face down in the bushes" approximately 20 feet from the vehicle. Close woke him, at which point he "slowly started waking up and sitting up." A Jeep key, later used to access the vehicle in the driveway for an inventory, was located in defendant's pocket. Close testified that he noticed a strong odor of alcohol coming from defendant's person and observed a "large wet mark" on the front of defendant's pants.

¶ 6     On cross-examination, Close confirmed that defendant had a "thick" accent but that they did not have any trouble communicating with one another.

¶ 7     Footage from Close's body-worn camera was admitted into evidence and was time stamped June 21, 2024, at 9:44 p.m. Defendant could be seen exiting the bushes on his knees, lying back down on the ground, and closing his eyes. The deputies asked if he needed medical attention and did not receive a response. Another deputy attempted to shake defendant awake, at which point defendant awoke and returned to a kneeling position. Defendant eventually stood up and, with assistance, walked over to a picnic table. Defendant stated more than once that he did not know

what he did. When asked why he parked on someone's property, defendant responded that he was just tired.

¶ 8         The State next called Will County Sheriff's Deputy, Derek Nagel. Nagel testified that, along with all required testing and training, he completed and passed the testing for DUI refresher courses and an advanced DUI detection class. On June 21, 2024, he self-dispatched to the residence at issue. He observed a Jeep in the driveway and noticed that it had expired license plates. The certified registration for the Jeep was admitted into evidence.

¶ 9         Nagel further testified that he asked defendant whether he was alone inside the vehicle when the homeowner made his report, and defendant answered in the affirmative. Defendant confirmed that he was wearing his seatbelt while driving and that he pulled into the driveway to find a place to sleep. Nagel asked defendant where he was coming from, and defendant responded that he was coming from work at that he had gotten off at "5:00, 5:30, 6:00, 7:00." Nagel denied having difficulty communicating with defendant but observed that he had "bloodshot, glassy eyes and a strong odor of alcoholic beverage emitting from his breath." He was an arm's length away from defendant when he made these observations. Defendant denied drinking any alcohol.

¶ 10        Nagel testified that he then asked defendant whether he had anything wrong with his eyes, and defendant responded that his left eye was "weird" but that it was okay. Nagel then held one finger approximately 12 inches from defendant's face to confirm defendant could see it, which he could. Pursuant to Nagel's questioning, defendant denied having any medical issues with his head or body or having any medical issues for which he sees a doctor. Defendant denied taking any prescription medication.

¶ 11        Nagel proceeded with the administration of the HGN test, which looks for involuntary jerking of the eye. Nagel explained the instructions to defendant, who appeared to understand.

Nagel testified that he "observed six of six clues, lack of smooth pursuit in both eyes, distinct and sustained nystagmus at maximum deviation in both eyes[,] and onset of nystagmus prior to 45 degrees. That's two clues in each eye to make up six." He testified that the decision point for the HGN test, which "shows that the subject has consumed alcohol," is four clues.

¶ 12 Nagel next administered the walk-and-turn test, where the subject is instructed to take nine heel-to-toe steps down a line, make a series of small steps to turn around, and then take nine heel-to-toe steps back. The subject must keep their hands on their legs, look down at their toes, count each step aloud, and complete the test without stopping. Defendant performed as follows:

"He failed to remain in the starting position during the instructional phase, he stepped off line on several steps on the away and return portion. He missed heel[-]to[-]toe on several steps on the away and return portion. He took a total of 23 steps on the away portion and 19 steps on the return portion. After completing the *** away and more, he stopped the test and started asking what he's supposed to do before completing the return portion. He used his arms for balance throughout the test, and then I can't remember the last clue that he had."

After having his recollection refreshed with his police report, Nagel testified that the last clue was defendant's failure to take a series of small steps to turn around. Nagel observed seven out of eight clues in the walk-and-turn test and testified that the decision point to indicate impairment was two clues. At that point, Nagel noticed a large wet spot "[r]unning down [defendant's] pant leg from his groin."

¶ 13 Nagel then administered the one-leg-stand test, where the subject is instructed to raise one foot six inches off the ground and parallel to the ground, count out loud until instructed to stop, keep his hands on his legs, and look down at his toes. Defendant proceeded to use his arms for

4

balance during the test, put his foot down several times, and swayed side-to-side. Nagel observed three out of four clues for this test and testified that the decision point to indicate impairment was two clues.

¶ 14    Nagel testified that he formed the opinion that defendant should not have been operating a motor vehicle at that point based on his observations of a "[s]trong odor of alcoholic beverage coming from [defendant's] breath, bloodshot, glassy eyes, signs of impairment on standardized field sobriety tests," the nature of the report from the homeowner, and the wet spot on his groin. Defendant was subsequently arrested.

¶ 15    On cross-examination, Nagel acknowledged that a person's eyes can be bloodshot for reasons other than alcohol consumption (including being tired), and he did not know what time defendant woke up that morning. He further confirmed that, while he smelled alcohol on defendant's breath, that could not tell him when he consumed alcohol, how much, or what type. Nagel testified that the HGN test shows whether a person has consumed an amount of alcohol or other drugs that is "[m]ore than a normal dose for that person."

¶ 16    Footage from Nagel's body-worn camera was admitted into evidence. Defendant indicated that he left work at approximately 7:00 pm or 8:00 pm and denied drinking alcohol. The video also included the administration of the various field sobriety tests administered by Nagel. The wet mark on the front of defendant's pants was visible; defendant denied that it was urine.

¶ 17    The State rested. Defendant moved for a directed finding as to both counts. The court denied the motion as to count I (DUI) and granted it as to count II (expired license plates). Defendant rested without presenting evidence.

¶ 18    The court found defendant guilty of count I. In doing so, the court found Close and Nagel credible. The court considered the totality of the circumstances and noted that defendant admitted

5

driving the vehicle and turning onto private property, and he was subsequently located face-down in the bushes where he had to be woken up. The court observed that he "appear[ed] slightly confused" upon awaking. The court further reasoned that, while defendant performed field sobriety tests and did not fall, he did have to be supported as he walked away from the bushes.

¶ 19    Defendant filed a motion to reconsider, arguing that the State failed to prove beyond a reasonable doubt that defendant was in actual physical control of the vehicle while intoxicated. The motion was denied.

¶ 20    Defendant was sentenced to 12 months of conditional discharge and ordered to complete 240 hours of community service, attend a victim impact panel, obtain a DUI evaluation, complete counseling and aftercare, and pay $3,000 in fines. This appeal followed.

¶ 21                                II. ANALYSIS

¶ 22    On appeal, defendant argues that the court abused its discretion in admitting and considering the results of the HGN test because Nagel's testimony failed to lay the necessary foundation.

¶ 23    As conceded by defendant, he forfeited this evidentiary issue by failing to object to the admission of the HGN test results at trial. See *People v. Presley*, 2023 IL App (5th) 230970, ¶ 28. However, forfeiture is not absolute, and "[t]he plain-error rule bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error in specific circumstances" when invoked by the appealing party. (Internal quotation marks omitted.) *Id.* ¶ 29 (quoting *People v. Thompson*, 238 Ill. 2d 598, 613 (2010)). Defendant argues that the court's admission of the HGN test results should be reviewed under the plain-error doctrine. "Whether there is plain error is a question of law, which we review *de novo*." *People v. Williams*, 2022 IL 126918, ¶ 48.

¶ 24    Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Appellate review of a forfeited error is appropriate under two circumstances or "prongs":

> "Under the first prong, plain-error review is applied when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error. [Citation.] Under the second prong, plain-error review is applied when a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Presley*, 2023 IL App (5th) 230970, ¶ 30.

The defendant carries the burden of persuasion. *Id.*

¶ 25    Defendant asserts first-prong plain error on appeal, and we first determine whether a clear or obvious error occurred when the court admitted the HGN test results at trial.

¶ 26    The National Highway Traffic Safety Association (NHTSA) has published a training manual that establishes the proper procedure for law enforcement to follow when administering an HGN test in the field. NHTSA DWI Detection and Standardized Field Sobriety Testing Instructor Guide (2023), https://www.nhtsa.gov/sites/nhtsa.gov/files/2023-03/15911-SFST_Instructor_Guide_2023-tag.pdf (last visited March 26, 2026) (NHTSA Manual). Initially, we note that the NHTSA Manual does not appear in the record on appeal; however, defendant requests for the first time in his opening brief that we take judicial notice of it. A reviewing court may take judicial notice of readily verifiable facts if it facilitates the efficient disposition of a case, including where judicial notice was not requested in the trial court. *Aurora Loan Services, LLC v.*

7

*Kmiecik*, 2013 IL App (1st) 121700, ¶ 37. For example, we "may take judicial notice of information on a public website even though the information was not in the record on appeal." *People v. Crawford*, 2013 IL App (1st) 100310, ¶ 118 n.9. In this case, we are able to obtain the manual through NHTSA's website and will therefore take judicial notice of the same.

¶ 27        The NHTSA Manual describes three clues law enforcement officers should note during the administration of the HGN test, as they may indicate alcohol consumption: (1) lack of smooth pursuit of the eyes, (2) distinct and sustained nystagmus and maximum deviation, and (3) onset of nystagmus prior to 45 degrees. The NHTSA Manual sets forth a ten-step procedure for officers to follow, including "pre-test checks." During the first step, the officer should check for eyeglasses and note whether the subject wears contacts. Eyeglasses should be removed. During step two, the officer provides verbal instructions for the test, including for the subject to put his feet together, keep his hands to his side, keep his head still, look at the stimulus, follow the stimulus with his eyes only, and continue looking at the stimulus until he is told that the test is over. During step three, the officer should position the stimulus 12-15 inches in front of the subject and slightly above eye level. During step four, the officer should check for equal pupil size and resting nystagmus. During step five, the officer should check for equal tracking of the subject's eyes as the stimulus is moved from center to far right and far left, then back to center. The speed of the stimulus should be approximately the same speed subsequently used in step six. At this point, all pre-test checks will have been completed. During step six, the officer watches for a lack of smooth pursuit in the subject's eyes as the officer smoothly moves the stimulus. Each eye should be checked at least twice. During step seven, the officer watches for distinct and sustained nystagmus at maximum deviation, checking each eye at least twice. "Distinct and sustained nystagmus is evident when the eye is held at maximum deviation for a minimum of four seconds and continues

to jerk toward the side." During step eight, the officer watches for the onset on nystagmus prior to 45 degrees. Each eye should be checked at least twice. During step nine, the officer should total the clues, with each eye receiving separate points for each clue that is present. The total maximum number of possible clues is six. During step ten, the officer checks for vertical nystagmus, where the stimulus is held at an elevated level for a minimum of four seconds.

¶ 28       "[T]o be a reliable indicator of alcohol consumption, HGN field testing must be performed in accordance with the NHTSA protocol." *People v. McKown*, 236 Ill. 2d 278, 298 (2010) (*McKown II*). "Evidence of HGN testing, when performed according to protocol by a properly trained officer, is admissible for the purpose of showing that the subject has likely consumed alcohol." *People v. Motzko*, 2017 IL App (3d) 160154, ¶ 21. The results of an HGN test are admissible where a proper foundation for the results has been laid, "including a showing that the witness is properly trained and that he performed the test in accordance with proper procedures." *Id.* at 306. With the proper foundation, a testifying officer "may use the HGN test results as a part of the basis for his opinion that the defendant was under the influence and impaired." *Id.*

¶ 29       In *McKown II*, our supreme court held that there was inadequate foundation for the admission of HGN test results where the administering officer, contrary to the procedures set forth by NHTSA,

> "did not testify that he checked [the defendant's] eyes for equal tracking before conducting the HGN test. He did not testify that he checked her eyes for equal pupil size. He did not describe the speed at which he moved the stylus or that he held the stylus at the point of maximum deviation for the requisite four seconds. He did not testify that he repeated the procedure twice, as NHTSA protocol requires. Finally, he confused two of the clues when he combined two steps in the protocol." *Id.* at 307.

Because the trial court "relied heavily on the improperly admitted" test results, as there were no other field sobriety tests administered and the defendant's blood-alcohol content was not chemically tested, the defendant's conviction was reversed. *Id.* at 311.

¶ 30         Similarly here, Nagel did not testify that he checked defendant's eyes for equal tracking, equal pupil size, or resting nystagmus prior to administering the HGN test. He did not testify that he repeated any of the steps as required. He also failed to detail the speed at which he moved the stimulus during the test or confirm that he held the stimulus at the point of maximum deviation for at least four seconds. While Nagel explained that he had passed all necessary training and testing at the police academy and had additional training in the form of DUI refresher courses and an advanced DUI detection class, he did not specifically testify that he had been properly trained according to the NHTSA Manual. Because the State failed to lay a proper foundation to establish that Nagel was properly trained and performed the test in accordance with the NHTSA Manual, the HGN test results were improperly admitted, and a plain or obvious error occurred.

¶ 31         Accordingly, we proceed to the second step of the plain-error analysis—whether the evidence was so closely balanced that the error threatened to tip the scales of justice against defendant. "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. To reverse a trial court under this prong of the plain-error doctrine, the evidence must be "so closely balanced that the guilty verdict may have resulted from the error." *Thompson*, 238 Ill. 2d at 613.

¶ 32         Here, excluding Nagel's testimony regarding defendant's HGN test results, a commonsense assessment of the remaining evidence demonstrates that it was not closely balanced. As acknowledged by defendant, he drove his vehicle down the driveway of a property he had no

10

connection with in order to find a place to sleep. He then exited his vehicle, traveled approximately 20 feet, and fell asleep face-down in the bushes. When law enforcement located him, he crawled out of the bushes, then laid back down and closed his eyes. After being non-responsive to law enforcement's questions, he had to be shaken awake, at which point he stood up and expressed confusion about the situation. He claimed that he was coming from work and had not consumed any alcoholic beverages, which is belied by Close and Nagel's observations that defendant had strong odor of alcohol emanating from his person and his breath. He also had a large wet stain on his groin that was consistent with urine. We observe that the stain was visible in Nagel's body-worn camera footage, and there were no wet marks visible on other parts of defendant's clothing. Although defendant was otherwise coherent and was not falling or stumbling, he did have to be physically supported by law enforcement while walking away from the bushes. Nagel also testified that defendant had "bloodshot, glassy eyes." Moreover, his performance on the walk-and-turn and one-leg-stand tests were consistent with alcohol impairment.

¶ 33        Unlike the trial court in *McKown II*, the court here did not rely heavily on the improperly admitted HGN test results. While the court noted the results of the field sobriety tests in its ruling, there were three total field sobriety tests for the court to consider, whereas in *McKown II*, the only test administered was the HGN test. The court was also presented with considerable non-field sobriety test evidence to support its finding of guilt. Accordingly, because the remaining evidence was more than sufficient to find defendant guilty of DUI beyond a reasonable doubt, defendant's first-prong plain-error argument fails.

¶ 34        In sum, because the evidence was not closely balanced, defendant's claim does not warrant plain-error review.

¶ 35                                    III. CONCLUSION

11

¶ 36    For the reasons stated herein, we affirm the judgment of the circuit court of Will County.

¶ 37    Affirmed.